## No. 20,767.

The Colorado Fuel and Iron Corporation *v.*
The Industrial Commission of Colorado, et al.
(392 P. [2d] 174)

Decided March 2, 1964.

Messrs. WELBORN, DUFFORD and COGBURN, for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mr. PETER L. DYE, Assistant, for defendant in error Industrial Commission of Colorado.

Mr. HAROLD CLARK THOMPSON, Mr. ALIOUS ROCKETT, Mr. FRANCIS L. BURY, for defendant in error State Compensation Insurance Fund.

Mr. EDWARD J. SCHEUNEMANN, for defendant in error Hattie M. Holman.

*En Banc.*

MR. JUSTICE PRINGLE delivered the opinion of the Court.

ON December 11, 1961, Richard Holman died from asphyxiation caused by the inhalation of a lethal dose of carbon monoxide gas while working for the Colorado Fuel and Iron Corporation and the sole question presented by this writ of error is whether his widow and surviving minor child are entitled to benefits under the Workmen's Compensation Act, C.R.S. '53, 81-1-1 *et seq.,* or whether the exclusive remedy lies under the Occupational Disease Disability Act, C.R.S. '53, 81-8-1 *et seq.* The employer in this case is self-insured under the Workmen's Compensation Act while it is insured with the State Compensation Insurance Fund under the Occupational Disease Disability Act. The Industrial Commission awarded benefits under the Workmen's Compensation Act and this award was affirmed by the district court.

The facts surrounding Holman's death are not in dispute and we deem it sufficient in this regard to quote from the referee's findings:

"The facts surrounding the immediate occurrence of

this unfortunate accident indicate that the decedent and two other employees were engaged in charging the furnace in the casting foundry of the employer. Their work was such that they would induce iron into the furnace by means of a charging bucket lowered through a cupola, placing this material atop fuel and limestone which were heated from a source below the charging floor. As a consequence of the heating and chemical changes in the fuel and limestone contained below the cupola floor, gases came through the cupola extending above the charging floor. When a hoist of material was operated to bring it into the charging area it was lowered with a bell, the clevis of which was engaged to a hook on the hoist. On this particular day the clevis and hoist hook became disengaged allowing the bell to drop some six feet into the cupola area atop the iron being induced into the foundry furnace. When this occurred, the heat previously being applied to the materials was stopped, thus creating what is known as a 'cool charge.' This, however, did not stop the previously-created fumes from rising through the area where the disengaged bell was lying atop the iron. In some mistaken thought to hasten reports of re-engaging the hook hoist in the clevis of the bell, the decedent clambered over the sides of the cupola and down into its interior to physically do this job. At this point he was noticed by his foreman to be standing in this area, who immediately ran toward the cupola window. As he was thus running, claimant (sic) fell apparently in an unconscious state to the iron atop the furnace. The foreman made an attempt to reach his side but also quickly became unconscious."

At the hearing before the referee, an industrial hygiene engineer employed by the Colorado Fuel and Iron Corporation testified that tests performed on a cupola adjoining that in which Holman met his death indicated percentages of carbon monoxide were present in the atmosphere within the cupola ranging from 3.3 per cent to 4.0 per cent and that a similar concentration would nec-

essarily exist in the other cupola. The record discloses that such a high concentration of carbon monoxide would cause death within one or two minutes upon exposure. The record further discloses that carbon monoxide tests were not normally made on cupolas because the employees of the company were not expected to be inside the same incident to their employment.

Dr. Robert Young, a physician and surgeon employed by the Colorado Fuel and Iron Corporation, testified as follows:

"Q: Now, doctor, assuming that this man did die as a result of carbon monoxide exposure, that exposure was of a very short duration and a single exposure, was it not? A: I think it was an instantaneous affair. By that I mean it was at the time. Yes. That was not an accumulative affair. Q: In other words, there is no history of anything that you were able to obtain that this man had been exposed to carbon monoxide posioning (sic) over a period of time? This was not an accumulative thing? A: No. I have known—I know Mr. Holman and have taken care of him in the emergency hospital for various minor injuries over the years in the past and this was a big, healthy man. Q: Now, if, in fact, the man did die as a result of carbon monoxide exposure, it was an exposure of only a very few minutes? A: It would have had to be. Yes, sir."

The employer's only contention here is that Holman died as a result of "poisoning by carbon monoxide," one of the diseases listed in the Occupational Disease Disability Act as being compensable under that Act, and that even though the poisoning resulted from an accident, benefits must be awarded exclusively under the Occupational Disease Disability Act and not under the Workmen's Compensation Act.

The Occupational Disease Disability Act of 1945 provides in pertinent part:

" 'Occupational disease' means only diseases enumer-

ated and specified in section 81-18-9." *C.R.S. '53 81-18-4 (4).*

*"Occupational diseases listed.* — The following diseases only shall be deemed to be occupational diseases, and compensation as provided in this article shall be payable for disability or death of an employee resulting from such diseases and from no others:

\* \* \*

"(16) Poisoning by carbon monoxide.

\* \* \* "

*C.R.S. '53, 81-18-9, as amended.*

*"Compensation exclusive remedy.* — In all cases where the employer and the employee are subject to the provisions of this article, and where the employer has complied with the provisions of this article regarding insurance, the liability of the employer under this article to such employee or to his spouse, children, parents, dependents, next of kin, personal representatives, guardian or any others for any injury to health or on account of death from any disease set forth in section 81-18-9 in any way contracted, sustained, or incurred by such employee in the course of, or because of, or arising out of his employment shall be exclusive and shall be in place of any and all civil liability whatsoever at common law or otherwise." *C.R.S. '53, 81-18-8.*

▉ We do not agree with the employer that the above sections of the Occupational Disease Disability Act operate so as to defeat the claim of Holman's widow and child under the Workmen's Compensation Act under the circumstances of this case. At the heart of the matter is the essential nature of the incident causing Holman's death and in our view his death was caused by an "accident" as that term is used in connection with the Workmen's Compensation Act and not by an "occupational disease."

▉ In 1935 this Court had occasion to define an "occupational disease" in *Industrial Commission v. Ule,* 97

Colo. 253, 48 P. (2d) 803. At that time disability or death from an "occupational disease" was not compensable by statute. That case involved death resulting from "dope" poisoning and in holding that the death was caused by an "accident" under the Workmen's Compensation Act and not by an "occupational disease," the following language was employed:

· "An occupational disease is one 'contracted in the usual and ordinary course of events, which from the common experience of humanity is known to be incident to a particular employment.' *Industrial Commission v. Roth,* 98 Ohio St. 34, 120 N.E. 172, 173, 6 A.L.R. 1463. It is one 'normally peculiar to and gradually caused by the occupation.' *Dillingham's Case,* 127 Me. 245, 142 A. 865. 'One which is due wholly to causes and conditions which are normal and constantly present and characteristic of the particular occupation.' *Seattle Can Co. v. Department of Labor & Industries,* 147 Wash. 303, 265 P. 739, 741."

And in *Prouse v. Industrial Commission,* 69 Colo. 382, 194 Pac. 625, this Court pronounced the rule that an "accident" under the Workmen's Compensation Act is an occurence traceable to a definite *time, place,* and *cause.*

These pronouncements were in accord with the general rule as articulated in 99 C.J.S., *Workmen's Compensation,* Sec. 169, pp. 559, 564, where we find the following:

"* * * The terms 'accident' and 'occupational disease,' as defined generally, and in connection with provisions of compensation acts, are distinguishable, in that an accident arises from a definite event, the time and place of which can be fixed, while the occupational disease develops gradually over a long period of time, and also in the fact that the accident might easily have been avoided, although the characteristic 'slow and gradual' development, has been held to be a relative term and, therefore, not always an accurate distinguishing element."

.Some ten years after the *Ule* definitions, the Legislature passed the Occupational Disease Disability Act

which supplies us with the following statutory guidelines:

"*Conditions of liability.* — An employer shall not be liable for compensation or other benefits under the provisions of this article for disability or death resulting from the diseases specified in section 81-18-9 except where the following conditions are shown to exist:

"(1) There is a direct causal connection between the conditions under which the work was performed and the occupational disease, *and the disease can be seen to have followed as a natural incident of the work and as a result of the exposure occasioned by the nature of the employment* and can be fairly traced to the employment as a proximate cause and does not come from a hazard to which workmen would have been equally exposed outside of the employment. The disease must be incidental to the character of the business and not independent of the relation of employer and employee. The disease need not have been foreseen or expected but after its contraction must appear to have had its origin in a risk connected with the employment, *and to have flowed from that source as a natural consequences.*

*       *       *

"(4) In the case of death from a disease other than silicosis, asbestosis, anthracosis, poisoning or disease caused by exposure to radio-active materials, substances, or machines, or fissionable materials, or any type of malignancy caused thereby or poisoning by uranium or its compounds, the death has resulted within one year from the date of the employee's last injurious exposure to such disease while actually working for the employer against whom compensation is claimed, * * *." (Emphasis supplied.) *C.R.S. '53, 81-10-10, as amended.*

■ Can it fairly be contended that the Legislature, in using words such as "natural incident of the work," "exposure occasioned by the nature of the employment," "to have flowed from that source as a natural consequence," and "last injurious exposure," intended that the Occupa-

tional Disease Disability Act was to apply to situations such as the one before us in the instant case? We think not. The obvious import of the Occupational Disease Disability Act is that the Legislature intended it to apply to situations which the Court in *Ule,* supra, said were not covered by the provisions of the Workmen's Compensation Act; that is, to situations where death or disability were not caused by an "accident." It was, in short, intended to serve as a supplement to broaden the field of industrial compensability and not to negative liability in situations traditionally covered by the Workmen's Compensation Act.

A line of Texas authority confirms the approach we have taken in the instant case. These cases involved the Texas statutes wherein dermatitis is specifically listed as an "occupational disease" and the law provides that in any case where the employment causes an acute disease which can be arrested by a change of employment or by medical treatment under which the employee will suffer no objective symptoms of such disease, the employee is entitled to compensation only for the period during which the disease persists in an acute state. See Sections 20 and 27, Article 8306, R.C.S., Vernon's Ann. Civ. St. In *Texas Employers' Insurance Association v. Cowan,* (Tex. Civ. App.) 271 S.W. (2d) 350, a co-worker moved a ladder upon which a pot of lacquer had been placed, causing the lacquer to fall upon the claimant; in *Texas Employers' Insurance Association v. Cross,* (Tex. Civ. App.) 358 S.W. (2d) 156, the claimant slipped and fell into a hole containing wet cement; in *Travelers Insurance Co. v. Grimes,* (Tex. Civ. App.) 358 S.W. (2d) 247, a sack of soda ash dust split and fell upon the claimant. The claimants in all three cases incurred dermatitis and were compensated for an accidental injury under the Texas workmen's compensation law. The Court of Civil Appeals of Texas affirmed in each case, distinguishing "accident" from "occupational disease" along the same lines which we have heretofore set

out; that is, that an "accident" is traceable to a particular time, place and cause, whereas an "occupational disease" is acquired in the usual and ordinary course of employment and is recognized from common experience to be incidental thereto. In *Texas Employers' Insurance Association v. Cowan,* supra, the court points out that to hold otherwise would be to construe the occupational disease statute in such a manner as to declare that it was intended to cut down the field of industrial compensability rather than to broaden it.

In the instant case, Holman's death is traceable to a definite time, place and cause. His death was not due to a condition acquired in the usual and ordinary course of his employment; it did not, in the language of our Occupational Disease Disability Act, follow "as a natural incident of the work" or "as a result of the exposure occasioned by the nature of the employment," nor did it flow "from that source as a natural consequence." This occurrence, in relation to Holman's employment, was not natural but unnatural, not ordinary but extraordinary, not usual but unusual. The employer admits that if it were not for the Occupational Disease Disability Act the claim would certainly be compensable under the Workmen's Compensation Act. An interpretation of the statute which would change this tragic event from a death by "accident" to one from an "occupational disease" would be such a cortortion of reality as to fly in the face of reason and we are not disposed to so interpret statutes.

The judgment is affirmed.