**Donald E. ANDERSON, Petitioner,**

**v.**

**David W. BRINKHOFF; Colorado Compensation Insurance Authority; and the Industrial Claim Appeals Office of the State of Colorado, Respondents.**

**No. 92SC271.**

Supreme Court of Colorado,
En Banc.

Sept. 27, 1993.

Rehearing Denied Oct. 25, 1993.

Wilcox & Ogden, P.C., Ralph Ogden, Denver, Steven U. Mullens, P.C., Steven U. Mullens, Colorado Springs, for petitioner.

Michael J. Steiner, Carolyn A. Boyd, Denver, for respondents.

Law Offices of Robert A. Weinberger, P.C., Robert A. Weinberger, Thomas A. Kanan, Denver, for amicus curiae Colorado Defense Lawyers Ass'n.

Chief Justice ROVIRA delivered the Opinion of the Court.

We granted certiorari to resolve an apparent conflict between the court of appeals decision below in *Anderson v. Brinkhoff,* 839 P.2d 487 (Colo.App.1992), and *Masdin v. Gardner–Denver–Cooper Industries, Inc.,* 689 P.2d 714 (Colo.App. 1984). We believe that *Masdin* correctly interprets the Workers' Compensation Act, and accordingly reverse the court of appeals and remand with directions.

I

Petitioner, Donald Anderson, has alpha–1 antitrypsin deficiency, a hereditary condition which causes progressive emphysema and associated heart problems. Anderson's condition may be summarized as follows. The human body releases trypsin to attack dust and other particles inhaled into the lungs. Generally, the body produces alphatron S antitrypsin which prevents the trypsin from attacking and damaging the lungs. Anderson's body does not produce enough antitrypsin. Thus, when Anderson inhales particles into his lungs, either intentionally (*i.e.,* smoking) or unintentionally (*i.e.,* inhalation of construction dust), his body releases trypsin to attack the particles. However, his body does not release enough antitrypsin to prevent the trypsin from attacking his lungs. Consequently, the trypsin generated by Anderson's body has destroyed the tissue of his lungs, causing hypoxemia and ultimately emphysema. Due to the hypoxemia, Anderson has developed core pulmonale which has resulted in permanent injury to his heart.

Anderson was employed as a carpenter from 1974 until 1988. Throughout his employment Anderson was exposed to airborne particles—sawdust and common construction site dust—which aggravated his disease. Additionally, Anderson smoked cigarettes from 1982 until 1986, which further contributed to the progression of his disease. Approximately one year after he quit smoking, Anderson was diagnosed with alpha–1 antitrypsin deficiency. He was advised to avoid all exposure to dust, including occupational exposure. Despite this warning he continued to work as a carpenter.

In July of 1988, Anderson started working as a carpenter for respondent, David Brinkhoff. Prior to this time Anderson worked for himself. Anderson testified that this change of employment was due to the fact that he could not meet the exertive requirements of working on his own. By this time he was suffering from a severe airflow limitation and heart disease secondary to his emphysema. During his employment with Brinkhoff, Anderson was exposed to sawdust and other common construction site dust. Brinkhoff was aware of Anderson's condition and was also aware that his continued occupational exposure was making his condition worse. By December 1988, Anderson's emphysema had become so severe that he was unable to continue working as a carpenter or in any other occupation.

In January 1989, Anderson filed a claim under the Workers' Compensation Act of Colorado [1] requesting compensation for his emphysema which was allegedly aggravated while he worked for Brinkhoff.

Finding that Anderson's occupational exposure was not a necessary precondition to his development of severe emphysema, the Administrative Law Judge (ALJ) concluded that both Anderson's occupational exposure and non-occupational cigarette smoking accelerated that disease. The ALJ also

---

**1.** Articles 40 to 54 of title 8 were entitled the "Workmen's Compensation Act of Colorado." § 8–40–101, 3B C.R.S. (1986). After Anderson filed his claim, the General Assembly changed the title to the "Workers' Compensation Act of Colorado." § 8–40–101, 3B C.R.S. (1992 Supp.). In the interest of clarity, we shall refer to articles 40 to 47 of title 8 as the Workers' Compensation Act.

found that Anderson's last exposure to occupational dust occurred while he was employed by Brinkhoff. Relying on *Masdin v. Gardner–Denver–Cooper Industries, Inc.*, 689 P.2d 714 (Colo.App.1984), the ALJ ruled that Anderson sustained an "occupational disease only to the extent that occupational conditions have contributed to [his] overall disability." The ALJ concluded that Anderson's "smoking and occupational dust exposures were co-equal aggravating factors in the acceleration of [his] severe emphysema. Therefore, 50% of [Anderson's] disease is attributable to his occupational exposures." Accordingly, the ALJ ruled that Anderson was entitled to 50% of the medical and disability benefits to which he otherwise would be entitled.

All parties appealed the ALJ's order to the Industrial Claim Appeals Office (ICAO) asserting that the ALJ misconstrued the statutory and decisional law on occupational diseases. A panel of the ICAO reversed, noting that the aggravation of Anderson's disease was equally attributable to exposure to employment hazards and exposure to hazards outside of his employment. Thus, it ruled that "the portion of the disease found to be attributable to [Anderson's] employment is not compensable and [his] claim for worker's compensation benefits must be denied and dismissed."

The court of appeals affirmed. Interpreting the occupational disease statute, the court concluded that "a claim must be denied if a non-industrial cause is an equally exposing stimulus even if a pre-existing condition exists." *Anderson*, 839 P.2d at 488. Accordingly, because Anderson's disease was equally aggravated by smoking and occupational dust, it concluded that compensation for the occupational portion was not appropriate.

## II

The specific section at issue defines occupational disease as:

[A] disease which results directly from the employment or the conditions under which work was performed, which can be seen to have followed as a natural incident of the work and as a result of the exposure occasioned by the nature of the employment, and which can be fairly traced to the employment as a proximate cause and *which does not come from a hazard to which the worker would have been equally exposed outside of the employment.*

§ 8–41–108(3), 3B C.R.S. (1986) (now codified at § 8–40–201(14), 3B C.R.S. (1993 Supp.)) (emphasis added). The thrust of Anderson's argument is that if section 8–41–108(3) is read as conveying a meaning distinct from the "arising out of" test mandated by section 8–52–102(1)(b), 3B C.R.S. (1986) (now codified at § 8–41–301(1)(b), 3B C.R.S. (1993 Supp.)),[2] such a construction would frustrate the legislative purpose in merging the Occupational Disease Disability Act of 1945 into the Workers' Compensation Act in 1975. Rather, he argues that the intent of the 1975 General Assembly in merging the two Acts was to make occupational diseases as fully compensable as occupational accidents. Accordingly, he asks us to construe the occupational disease statute, section 8–41–108(3), 3B C.R.S. (1986), as requiring no more than that the disease arise out of and in the course of employment. Although Anderson makes a plausible argument, we believe that the plain language of the statute sets forth additional requirements which must be met before an occupational disease will be found to be compensable under the Work-

---

**2.** Section 8–52–102(1), 3B C.R.S. (1986), entitled, "Conditions of recovery," provides:

(1) The right to the compensation provided for in articles 40 and 54 of this title, in lieu of any other liability to any person for any personal injury or death resulting therefrom, shall obtain in all cases where the following conditions occur:

(a) Where, at the time of the injury, both employer and employee are subject to the provisions of said articles and where the employer has complied with the provisions thereof regarding insurance;

(b) Where, at the time of the injury, the employee is performing service arising out of and in the course of his employment;

(c) Where the injury or death is proximately caused by an injury or occupational disease arising out of and in the course of his employment and is not intentionally self-inflicted.

ers' Compensation Act. However, we agree with Anderson that his occupational disease is compensable. Accordingly, we reverse.

## A

Historically, a distinction has existed between "occupational diseases" and "accidents/injuries," *Colorado Fuel & Iron Corp. v. Industrial Comm'n*, 154 Colo. 240, 244, 392 P.2d 174, 176–77 (1964); *Hallenbeck v. Butler*, 101 Colo. 486, 489, 74 P.2d 708, 710 (1937); *Industrial Comm'n v. Ule*, 97 Colo. 253, 256–57, 48 P.2d 803, 804 (1935), which has traditionally been justified by the difficulty in determining the cause of the claimed occupational disease. *See* Joseph LaDou et al., *Cumulative Injury or Disease Claims: An Attempt to Define Employers' Liability for Workers' Compensation*, 6 Am.J.L. & Med. 1, 12–13 (1980). Generally, occupational diseases were not compensable before the adoption of the Occupational Disease Act in 1945. *Hallenbeck*, 101 Colo. at 489, 74 P.2d at 710. *See* 1B Arthur Larson, *Workmen's Compensation Law* § 41.20 at 7–487 (1993). However, a disease was compensable if it was viewed as an accident—if it arose from "an unusual or excessive exposure at a time reasonably definite," and if "such condition was unexpected and occasioned by an accident." *See Great Am. Indem. Co. v. State Compensation Ins. Fund*, 108 Colo. 323, 326, 116 P.2d 919, 920 (1941); *Columbine Laundry v. Industrial Comm'n*, 73 Colo. 397, 399, 215 P. 870, 871 (1923); *Central Surety & Ins. Corp. v. Industrial Comm'n*, 84 Colo. 481, 485–86, 271 P. 617, 619–20 (1928).

In 1945, with passage of the Occupational Disease Act, specific occupational diseases became compensable. Ch. 163, 1945 Colo.Sess.Laws 435. *See Miceli v. State Compensation Ins. Fund*, 157 Colo. 204, 206, 401 P.2d 835, 837 (1965). However, even for the listed, and therefore compensable, diseases the employer was not liable unless:

> There [was] a direct causal connection between the conditions under which the work was performed and the occupation-al disease, and the disease can be seen to have followed as a natural incident of the work and as a result of the exposure occasioned by the nature of the employment and can be fairly traced to the employment as a proximate cause and *does not come from a hazard to which workmen would have been equally exposed outside of the employment.*

Ch. 163, sec. 10, 1945 Colo.Sess.Laws 435 (emphasis added). *Compare id. with Industrial Comm'n v. Anderson*, 69 Colo. 147, 150–51, 169 P. 135, 136 (1917) (quoting *In re McNicol*, 215 Mass. 497, 102 N.E. 697 (1913)). This framework was again utilized in 1973 when non-listed diseases became compensable for the first time, and has been carried forward to the present occupational disease definition.

In 1975, the General Assembly repealed the Occupational Disease Act, ch. 71, sec. 62, 1975 Colo.Sess.Laws 311; however, several of its provisions were incorporated into the Workers' Compensation Act. Among the retained provisions was the definition of occupational disease, which contains the specific language at issue. Ch. 71, sec. 5, 1975 Colo.Sess.Laws 293. By retaining the test for occupational disease, the legislature manifested the intention to subject occupational diseases to a more rigorous test than occupational accidents/injuries before they would be found to be compensable. If the legislature intended to subject occupational diseases only to the "arising out of test" contained within former section 8–52–102(1)(c) as Anderson argues, there would have been no need for the hazard/equally exposed language in section 8–41–108(3). We cannot assume that in retaining this language, which has been a part of the occupational disease law for almost fifty years, the General Assembly engaged in a meaningless act.

## B

Before a disease can be found to be a compensable occupational disease, it must meet each element of the four-part test mandated by section 8–41–108(3) which, in effect, operates as an additional causal limitation, ensuring that the disease "arise out

of and in the course of the employment." [3] This limitation is not unique to Colorado; most jurisdictions have similar limiting statutes, some virtually identical to section 8–41–108(3). *See, e.g.,* Ariz.Rev.Stat.Ann. § 23–901.01 (1983); Ind.Code Ann. § 22–3–7–10 (Burns 1992); Mont.Code Ann. § 39–72–408 (1991); Nev.Rev.Stat.Ann. § 617.-440 (Michie 1992); Mo.Ann.Stat. § 287.-067(1) (Vernon 1987); Tenn.Code Ann. § 50–6–301 (1991). *See also, e.g.,* Ala.Code § 25–5–110 (1992) ("[A] disease arising out of and in the course of employment, ... which is due to hazards in excess of those ordinarily incident to employment in general and is peculiar to the occupation in which the employee is engaged but without regard to negligence or fault, if any, of the employer."); Iowa Code § 85A.8 (1993) ("A disease which follows from a hazard to which an employee has or would have been equally exposed outside of said occupation is not compensable as an occupational disease."); N.M.Stat.Ann. § 52–3–33 (1991) (" '[O]ccupational disease' includes any disease peculiar to the occupation in which the employee was engaged and due to causes in excess of the ordinary hazards of employment as such...."); N.C.Gen.Stat. § 97–53(13) (1992) (occupational disease is "[a]ny disease ... which is proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment, but excluding all ordinary diseases of life to which the general public is equally exposed outside of the employment.").

This statutory limitation, in Colorado and elsewhere, is a legislative declaration that it is necessary to limit the scope of occupational diseases to those diseases which result from working conditions which are characteristic of the vocation.[4] It is this proof of causation that ensures that the Workers' Compensation Act will not become a general health insurance act. *See Booker v. Duke Medical Ctr.,* 297 N.C. 458, 256 S.E.2d 189, 200 (1979). Additionally, by compensating only those diseases which arise from a risk associated with the industry, the industry must bear only those costs associated with its production.[5]

3. The limitation can be construed as an additional "arising out of and in the course of employment" test where "arising out of" refers to the origin or cause of the occupational disease, and "in the course of" refers to the time, place, and circumstances under which the disablement resulting from an occupational disease occurred. *See Popovich v. Irlando,* 811 P.2d 379, 383 (Colo.1991); *City of Boulder v. Streeb,* 706 P.2d 786, 791 (Colo.1985). *See also Morrison v. Burlington Indus.,* 304 N.C. 1, 282 S.E.2d 458, 466 (1981).

4. In the words of one commentator:

The important boundary [is] ... the boundary separating occupational disease from diseases that are neither accidental nor occupational, but common to mankind and not distinctively associated with the employment....

A number of statutes contain detailed definitions of the term "occupational disease," and these statutory definitions give the clue to the distinction which is controlling for present purposes. The common element running through all is that of the distinctive relation of the particular disease to the nature of the employment, as contrasted with diseases which might just as readily be contracted in other occupations or in everyday life apart from employment. It will be observed at once that this test resembles the original "peculiar risk" test for the "arising out of employment" requirement.

1B Arthur Larson, *Workmen's Compensation Law* § 41.32 at 7–497–498 (1993).

5. As Judge Learned Hand said in *Grain Handling Co. v. Sweeney,* 102 F.2d 464, 465 (2d Cir.1939) (citations omitted):

In order to recover a workman must be exposed to hazards greater than those involved in ordinary living, and the disease must arise from one of these. But although we must find special dangers in the employment and that the disease arises from them, I can see no reason for limiting the protected class to those who have a normal resistance to such diseases, or for excluding those who are abnormally vulnerable. No doubt it would be most desirable that the second group should not be employed under such conditions at all, but we cannot charge them with ignorance, or carelessness, or acceptance of the risk, because they are. Such considerations are alien to the underlying theory of workmen's compensation, which makes industrial disabilities, so far as they are truly attributable to the industry, a part of the cost of production, and throws compensation for them upon the consumer. This is not because the consumer is at fault for creating the demand whose supply produces the disabilities, but because a loss shared among many is less a loss than if borne by one; the sum of the parts is less than the whole.

■ The specific language at issue in this appeal, requiring that the disease "does not come from a hazard to which the worker would have been equally exposed outside of the employment," effectuates what is termed the "peculiar risk" test and requires that the hazards associated with the vocation must be more prevalent in the work place than in everyday life or in other occupations. In other words, "the plaintiff must be exposed by his or her employment to the risk causing the disease in a measurably greater degree and in a substantially different manner than are persons in employment generally." *Young v. City of Huntsville*, 342 So.2d 918, 922 (Ala.Civ. App.1976).

Where there is only one cause of a disease the operation of the statute is clear—the risk, or hazard, of the disease cannot be equal to the risk experienced by the general public. Again, the hazard of the disease must be peculiar to the employment. *Compare Inspiration Consol. Copper Co. v. Industrial Comm'n*, 85 Ariz. 204, 335 P.2d 416, 421 (1959) (where no evidence to sustain finding of commission that exposure to silicon dioxide dust was greater at work site than in surrounding community; held, in the absence of such evidence "the hazard of aggravation of pre-existing silicotic condition was not an occupational hazard") *with Evans v. Indiana Univ. Medical Ctr.*, 121 Ind.App. 679, 100 N.E.2d 828, 830–31 (1951) (although pulmonary tuberculosis is a disease to which general public is exposed, for claimant who worked in sanatorium for treatment of tuberculosis "contraction of the disease is a hazard to which the workman would not have been equally exposed outside the employment"). The statute is equally clear in not requiring that hazardous conditions of employment be the sole cause of the disease or aggravation. Nevertheless, a claimant is entitled to recovery only if the hazards of employment cause, intensify, or aggravate—to some reasonable degree—the disability for which compensation is sought. This not only is the rule in Colorado but the rule in the majority of jurisdictions as well. *See, e.g., State Accident. Ins. Fund v. Mitchell*, 63 Or.App. 488, 664 P.2d 1134, 1138 (1983);

*Vause v. Vause Farm Equip. Co.*, 233 N.C. 88, 63 S.E.2d 173, 176 (1951). Thus, where a disease is produced solely by some extrinsic or independent cause it is not compensable.

■ Where, however, there are dual or concurrent causes of an occupational disease, the coverage afforded by the statute is less clear. *Compare, e.g.,* the majority and dissenting opinions in *Morrison v. Burlington Indus.*, 304 N.C. 1, 282 S.E.2d 458 (1981) *with* the majority and dissenting opinions in *Rutledge v. Tultex Corp./ Kings Yarn*, 308 N.C. 85, 301 S.E.2d 359 (1983). In such instances, the specific language at issue, "which does not come from a hazard to which the worker would have been equally exposed outside of the employment," has received differing interpretations in the court of appeals. In *Masdin v. Gardner–Denver–Cooper Indus.*, 689 P.2d 714 (Colo.App.1984), the claimant sought review of a final order of the Industrial Commission that awarded him a 25% permanent partial disability. For over forty years, the claimant had smoked between one and two and one-half packs of cigarettes a day. The hearing officer found that the claimant was totally and permanently disabled and that the claimant had sustained an occupational disease that was responsible for 25% of his total disability. The remaining 75% of claimant's disability was due to non-industrial hazards, principally smoking.

Noting that the occupational disease statute "contains an expression of legislative intent that diseases resulting from any 'hazard to which the worker would have been equally exposed outside of the employment' should not be compensable," the court of appeals found a competing policy of compensation for "any loss of income caused by injurious conditions of their employment." *Id.* at 717. Balancing these competing policies, the court held that where "there is no evidence that occupational exposure is a necessary precondition to development of the disease with which a claimant is afflicted then the claimant has sustained an occupational disease only to the extent that occupational conditions

have contributed to the claimant's overall disability." *Id.* at 717.

In contrast to the court of appeals opinion in *Masdin,* is its decision in *Hall v. Industrial Claim Appeals Office,* 757 P.2d 1132 (Colo.App.1988), wherein the court stated:

> [T]he fact of a preexisting hypersensitivity or secondary cause does not defeat a claim for occupational disease unless it can be shown that a non-industrial cause was an equally exposing stimulus.

*Id.* at 1133. Relying on this statement from *Hall,* the court of appeals below asserted that *"Masdin* must be reconciled with the statutory provision requiring compensation for an occupational disease only when the disease does not result from a hazard to which a claimant has been equally exposed outside of the employment." *Anderson v. Brinkhoff,* 839 P.2d 487, 488 (Colo.App.1992). Accordingly, the court held that Anderson's disease was not compensable because it arose from an "equal exposure to hazards from employment and outside employment...." *Id.* The court concluded that "[t]o hold otherwise would ignore the clear definitional requirement of § 8–41–108(3)." *Id.* at 489. We disagree. The statute does not invite a weighing of the various hazards to which a worker has been exposed throughout his lifetime—some occupational, some not—in determining whether a particular disease is occupational. Rather, it operates to ensure that a particular disease results from a hazard which is occupational in nature. We agree with the court of appeals in *Masdin;* where there is no evidence that occupational exposure to a hazard is a necessary precondition to development of the disease, the claimant suffers from an occupational disease only to the extent that the occupational exposure contributed to the disability.

No party asserts that the *cause* of Anderson's disease is occupational in nature—alpha 1 antitrypsin deficiency is genetic. Additionally, it is undisputed that the occupational exposure was not a necessary precondition to the development of the disease. However, Anderson asserts that the aggravation of his condition is compensable in that occupational exposure to dust accelerated the disease's progress. We agree. The risk associated with the exposure to sawdust and other airborne particulate matter is greater for a carpenter than the risk of exposure outside the workplace. Thus, the risk, or hazard, of the aggravation of Anderson's disease was occupational in nature, and is compensable. The ALJ found that occupational dust exposure was a co-equal aggravating factor in the acceleration of Anderson's emphysema, and therefore 50% of his disease was attributable to occupational exposure. Because this percentage is supported by the evidence, Anderson is entitled to an award based upon it.

Accordingly, we reverse and remand to the court of appeals with directions to reverse the Industrial Claim Appeals Office, and to direct it to reinstate the order of the Administrative Law Judge.