No. 75,729

HARRY BURTON, *Appellant,* v. ROCKWELL INTERNATIONAL, *Appellee.*

(967 P.2d 290)

Opinion filed October 30, 1998.

*Mark S. Gunnison,* of Payne & Jones, Chartered, of Overland Park, argued the cause and was on the brief for appellant.

*John W. Fresh,* argued the cause, and *Larry R. Mears,* of Larry R. Mears, Chartered, of Atchison, was with him on the briefs for appellee.

The opinion of the court was delivered by

LARSON, J.: In this workers compensation appeal, Harry Burton questions whether apportionment of an award is required under K.S.A. 44-5a01(d) when both occupational and nonoccupational factors combine to cause disability.

The Workers Compensation Board (Board) affirmed a finding that Burton was permanently and totally disabled from adult-onset asthma and bronchitis caused by both smoking and dirt, dust, and chemical fumes at his place of employment, but upheld the administrative law judge's (ALJ) determination that Burton was only entitled to 25% of the disability award under the apportionment provisions of the occupational disease statute.

In an unpublished split decision filed February 6, 1998, the Court of Appeals reversed the Board, finding the apportionment statute did not apply under the facts of this case.

We granted the employer's, Rockwell International's, petition for review, which contended the Court of Appeals' majority had not distinguished our prior contrary opinion of *Weimer v. Sauder Tank Co.*, 184 Kan. 422, 337 P.2d 672 (1959).

The Court of Appeals' decision set forth the facts, which we quote from its opinion:

"Burton worked for Rockwell at a steel foundry from 1955 until January 7, 1991. During his employment, Burton was exposed to dust, dirt, and other chemical fumes. Burton was also an avid smoker, smoking approximately one pack of unfiltered cigarettes a day for over 30 years until quitting in 1991.

"In the first 7 years of his employment, Burton worked as a chipper/grinder at the facility. Burton's job entailed shaving sharp edges off iron castings by using an air hammer with a chisel and then smoothing the castings with a grinder. At the end of a typical workday, Burton's clothing would be covered with black dirt and dust, and he would be so congested from breathing in the environment that he could produce a black sputum.

"Following his job as a chipper/grinder, Burton worked for the next 20 years primarily as a welder. Burton's duties entailed welding cavities in metal and putting various metal pieces together. Burton later worked on a government project in which he checked castings to determine if they complied with the appropriate standards. While working on this project, Burton was also assigned to work at the shake-out table. The shake-out table is a vibrating table where debris from the floor is sorted to find metal pieces that could be reused. Burton stated that the

environment around the shake-out table was particularly dirty and, by the end of the day at this position, he would be congested.

"When Burton started working at the foundry, Rockwell did not provide protective breathing devices to the employees. In the 1960's, Rockwell offered cotton dust masks, which could be changed throughout a day as the mask collected dust and dirt. Burton was required to wear a mask when welding and was encouraged to wear one when performing other tasks at the foundry. However, Burton said the masks did not completely prevent him from breathing dust because black dirt continued to accumulate in his breathing passages.

"In the 1970's, automatic air helmets were provided to the welders as a substitute for the cotton dust masks. Burton acknowledged that the air helmets helped "quite a bit" but stated that he still noticed the dust.

"During the final years of his employment, Burton became more congested and developed problems breathing. In November 1990, Burton left work and was treated by his primary treating physician, Dr. James Rider, for bronchial pneumonia. In January 1991, Dr. Rider gave Burton a return to work slip with a restriction not to work in a dusty or dirty environment. When Burton returned to the foundry, he was assigned to work at the shake-out table. He tried to work for several hours, but the dust and fumes made him sick and he was forced to leave. Burton briefly attempted to return to work in February 1992, but he again had problems breathing in the work environment and was sent home.

"Burton was examined by two pulmonary disease specialists. Dr. Gerald Kerby first examined Burton in 1991 at Rockwell's request. Dr. Kerby diagnosed Burton as suffering from adult-onset asthma superimposed on some mild obstructive airways disease. In March 1992, Dr. Kerby re-examined Burton and found that he continued to suffer from asthma, which was exacerbated by his exposure to dust and other irritants at work.

"Dr. Kerby could not identify the cause of the asthma but stated that he did not believe that Burton's occupation was related to causation because none of the substances Burton had been exposed to at work was a sensitizing agent which causes asthma. Dr. Kerby believed the exposure to the dust and other irritants associated with the foundry transiently worsened his asthma and might have had a small effect on its severity. Dr. Kerby testified that these occupational and nonoccupational factors combined to give Burton a functional pulmonary impairment of 30 percent of the whole body. The doctor stated that 5 to 10 percent of the 30 percent was possibly attributed to occupational factors, and the remaining percentage was possibly attributed to nonoccupational factors.

"Burton was next examined by Dr. Robert Durie in September 1991. Dr. Durie agreed with Dr. Kerby that Burton had a significant airways disease and asthma which were severely exacerbated when he returned to work after his pneumonia. Dr. Durie diagnosed Burton as suffering from a chronic obstructive pulmonary disease, which includes chronic bronchitis and asthma. Dr. Durie opined that Burton's asthma and bronchitis were due to his cigarette smoking and his exposure to noxious fumes and smoke at his work environment. However, Dr. Durie was

unable to offer an opinion on which of these factors was more significant in developing the disease.

"All of the doctors who examined Burton agreed that he would be unable to work at the steel foundry because of the exposure to dust, chemical, fumes, and extreme temperature. Dr. Rider also stated that in his opinion, Burton is permanently and totally disabled from engaging in any type of occupation."

After Burton filed his claim and evidence was presented, the ALJ, in deciding to apportion the total disability award, ruled:

"Claimant makes the argument that apportionment is not appropriate based on the circumstances of this case because there is no evidence that claimant's occupational disease was aggravated by the non-occupational factors to the point of a disability or that a disability from the non-occupational factors was aggravated by the occupational disease. In other words, claimant contends that there is no evidence that his smoking or other non-occupational factors contributed to his disease to the point of a disability in the absence of the occupational factors. While there is evidence that the occupational and non-occupational factors have merely combined to produce claimant's disability. Dr. Kerby's written reports clearly state that claimant has had exacerbations and aggravations of his idiopathic adult onset asthma by exposure to the dust and fumes at the foundry which has made it difficult to impossible for claimant to consistently work in that environment.

"It appears that the intent of the legislature was to compensate one for only the extent of disablement caused by an occupational disease if the respective causative factors can be determined and applied as a percentage. The word 'disability' in this section of the statute appears to refer to the entire disease process contracted by a claimant, part of which is made up of non-occupational factors. Read in the entire context of the Act, this is the only rational meaning that could be given to this particular subsection consistent with the apparent intent that the legislature had in mind in limiting an employer's liability to only those matters or factors for which it should be at risk, in this case dust and fumes generated by the plant itself."

When review of the ALJ's decision was requested by both parties, the Board upheld the ALJ's ruling that disability refers to the entire disease process even though the apportionment statute refers to causes of a disability, and refused to define disability solely in terms of its effect on Burton's employment. The Board found apportionment was appropriate because the causes of the disease are also causes of the disability.

The Court of Appeals, in reversing the finding that the apportionment statute applied, adopted the reasoning of *Fry's Food Stores v. Industrial Com'n*, 177 Ariz. 264, 268, 866 P.2d 1350

(1994), which held that the Arizona apportionment statute "requires apportionment of disabilities, not apportionment of the different causes of a single disability."

The Court of Appeals emphasized the difference between impairment and disability, noting that the former refers to a medical loss, while the latter means a loss of earning capacity. The majority of the panel concluded, based upon the findings of the ALJ, that Burton's disability did not occur until after he was exposed to the dust and fumes at his work environment, despite the fact that he may have suffered a previous impairment.

Judge Lewis dissented, arguing that the majority decision creates a retirement plan for those who ruin their health by smoking. The dissent would have followed *Jenkins v. Halstead Industries*, 17 Ark. App. 197, 706 S.W.2d 191 (1986), on the issue of apportionment.

Interestingly, the issue we do not consider because it is not before us is the decision of the Board not to apportion future medical benefits despite Rockwell's argument below that these benefits are "compensation" as contemplated in K.S.A. 44-5a01(d). The Court of Appeals' decision that Rockwell's cross-appeal was untimely was not raised in a petition for review and is therefore final.

*Standard of Review*

Our standard of review is statutorily defined by the Act for Judicial Review and Civil Enforcement of Agency Actions, K.S.A. 77-601 *et seq*. See *Nance v. Harvey County*, 263 Kan. 542, 550-51, 952 P.2d 411 (1997). Under K.S.A. 77-621(c), we may grant relief if we find the agency has erroneously interpreted or applied the law.

This case requires us to interpret the meaning of K.S.A. 44-5a01(d), which is a question of law over which we have unlimited review. *Miami County v. Svoboda*, 264 Kan. 204, Syl. ¶ 1, 955 P.2d 122 (1998). Although we do give deference to the agency's interpretation of the law, if such interpretation is found to be erroneous, we are to take corrective action. *Boatright v. Kansas Racing Comm'n*, 251 Kan. 240, Syl. ¶ 9, 834 P.2d 368 (1992).

In interpreting the Workers Compensation Act (Act), we look to our rules of construction, which need not be repeated but are set forth in *Todd v. Kelly*, 251 Kan. 512, 515-16, 837 P.2d 381 (1992).

Although we will also consider other provisions of the occupational disease statute, the specific provision we consider is K.S.A. 44-5a01(d), which states:

"Where an occupational disease is aggravated by any disease or infirmity, not itself compensable, or where disability or death from any other cause, not itself compensable, is aggravated, prolonged, accelerated or in any wise contributed to by an occupational disease, the compensation payable shall be reduced and limited to such proportion only of the compensation that would be payable if the occupational disease were the sole cause of the disability or death, as such occupational disease, as a causative factor, bears to all the causes of such disability or death, such reduction in compensation to be effected by reducing the number of weekly or monthly payments or the amounts of such payments, as under the circumstances of the particular case may be for the best interest of the claimant or claimants."

This provision relates to the apportionment of a disability award under two different situations: (1) where a preexisting occupational disease is aggravated by any disease which is not compensable; and (2) where a disability which is not compensable is aggravated in some manner by an occupational disease. Both parties agree that only the second situation is possibly applicable to the facts of the present case, as Burton did not suffer from a preexisting occupational disease.

In arguing that the apportionment statute should not apply to this case, Burton points out that the majority of jurisdictions that have considered this issue and the preeminent treatise in this area follow the approach adopted by the Court of Appeals. See *Fry's*, 177 Ariz. at 266-67; *Pullman Kellogg v. Workers' Comp. Appeals Bd.*, 26 Cal. 3d 450, 454-55, 161 Cal. Rptr. 783, 605 P.2d 422 (1980); *Kingery v. Ford Motor Co.*, 116 Mich. App. 606, 617-19, 323 N.W.2d 318 (1982); *Rutledge v. Tultex Corp.*, 308 N.C. 85, 103-05, 301 S.E.2d 359 (1983); 3 Larson's Workers' Compensation Law § 41.64(d) (1997).

Rockwell asserts we should give great deference to the Board and that the Court of Appeals ignored our prior interpretation of the apportionment statute as expressed in *Weimer*. It urges us to adopt the holding and rationale of *Jenkins*.

We do not read *Weimer* as controlling precedent on the apportionment issue. While an apportionment award was upheld in *Wei-*

*mer*, our court was not asked to interpret the apportionment statute or render any decision as to its applicability to the facts of that case. The only issue we considered in *Weimer* was the sufficiency of the evidence to support the trial court's determination that the claimant suffered a disability due to his work environment. See *Weimer*, 184 Kan. at 426-28. As such, the interpretation and applicability of the apportionment statute remains one of first impression for this court.

K.S.A. 44-5a01(d) refers to an aggravation of "disability or death." A "disability" resulting from an occupational disease is separately defined in K.S.A. 44-5a04(a) in the following manner:

" '[D]isablement' means the event of an employee becoming actually incapacitated, partially or totally, because of an occupational disease, from performing the employee's work in the last occupation in which injuriously exposed to the hazards of such disease, and 'disability' means the state of being so incapacitated."

We held in *Knight v. Hudiburg-Smith Chevrolet, Olds., Inc.*, 200 Kan. 205, 209, 435 P.2d 3 (1967), that the term "disability," when attributable to occupational disease, relates to loss of earning capacity. See *Slack v. Thies Development Corp.*, 11 Kan. App. 2d 204, 718 P.2d 310, *rev. denied* 239 Kan. 694 (1986); 82 Am. Jur. 2d, Worker's Compensation § 380, p. 414. The Board's decision, which ignores this definition and equated disability with the entire disease process such that the "causes of the disease are, therefore, also causes of the disability," is not based on persuasive authority when considering occupational disease in the workers compensation field as defined in our prior opinions.

The most persuasive authority in analyzing the cases in this area is 3 Larson's Workers' Compensation Law § 41.64(d) (1997), where the two views of various states are compared and the desirable result is summed up by the following statement: "The crucial distinction, then, is between apportioning disability and apportioning cause. The former is possible in the minority of states having apportionment statutes; *the latter is never possible.*" (Emphasis added.)

The leading case is the *Fry's* decision from Arizona, which is factually similar to our case. The claimant there suffered from

chronic obstructive pulmonary disease due to his smoking habit and then developed a condition known as "baker's lung" due to his 7-year exposure to flour dust at a flour mill.

The Arizona Supreme Court reversed the Court of Appeals' apportionment of the disability award, which had reversed the ALJ's decision not to apportion. The *Fry's* court noted the distinction between impairment and disability and stated that while an impairment is necessary to obtain a disability award, an individual suffering an impairment may not necessarily incur a disability. The court held that if a claimant has a prior impairment, but no disability, the apportionment statute would not apply. Turning to the facts of its case, the *Fry's* court found there was no evidence that the claimant incurred a disability until being exposed to the flour dust or that he would have been disabled in the absence of such exposure. 177 Ariz. at 267.

The Arizona court emphasized that its statute "requires apportionment of disabilities, *not* apportionment of the different causes of a single disability." 177 Ariz. at 268. The court then relied on the quote from Larson which we have previously set forth herein.

The *Fry's* case discredits the *Jenkins* holding by stating that the Arkansas Court of Appeals' opinion "confuses causation and apportionment." 177 Ariz. at 269.

Judge Lewis' dissent correctly points out policy reasons for requiring apportionment, but the legislature has not clearly acted so that apportionment is required. Burton buttresses his position by pointing to the clear requirement of apportionment in cases dealing with pulmonary or other types of emphysema contained in the wording of K.S.A. 44-5a01(b), which states:

"*Provided,* That compensation shall not be payable for pulmonary emphysema or other types of emphysema unless it is proved, by clear and convincing medical evidence to a reasonable probability, that such emphysema was caused, solely and independently of all other causes, by the employment with the employer against whom the claim is made, except that, if it is proved to a reasonable medical probability that an existing emphysema was aggravated and contributed to by the employment with the employer against whom the claim is made, compensation shall be payable for the resulting condition of the workman, but only to the extent such condition was so contributed to and aggravated by the employment."

If the legislature desired to require apportionment in all cases of a disease producing a single disability, it could have utilized the wording set forth above. By its failure to do so, a different result is required where the diagnosis is some type of emphysema.

There may be a policy reason to require apportionment in cases like the one before us, but such should be the decision of the legislature and not the court. The clear weight of authority around the country is contrary to the argument of the Court of Appeals' dissent, which would apportion causation and not disability. We construe K.S.A. 44-5a01(d) as not requiring apportionment where a disease producing a single disability is caused by both occupational and nonoccupational factors. K.S.A. 44-5a01(d) does not apply under the facts of this case.

The Court of Appeals is affirmed. The Board is reversed in part and affirmed in part. The case is remanded to the Board to enter an order consistent with the directions of this opinion.