GEORGE DESCHENES *v*. TRANSCO, INC., ET AL.
(SC 17852)
(SC 17853)

Rogers, C. J., and Norcott, Katz, Palmer, Vertefeuille, Zarella and Sullivan, Js.

Argued September 6, 2007—officially released August 12, 2008

*Lucas D. Strunk*, with whom was *John W. Greiner*, for the appellants in each case (defendant Reed and Greenwood Insulation Company et al.).

*Christopher Meisenkothen*, for the appellee in both cases (plaintiff).

*Robert F. Carter* and *Donna Civitello* filed briefs for the Connecticut Coalition of Taft-Hartley Health Funds, Inc., et al., as amici curiae.

*John M. Creane* and *Nathan J. Shafner* filed a brief for the New England Health Care Employees Union, District 1199, SIEU, as amicus curiae.

*Stephen C. Embry* filed a brief for the Workplace Injury Law and Advocacy Group as amicus curiae.

*Richard S. Bartlett* filed a brief for the Connecticut Business and Industry Association et al. as amici curiae.

*Opinion*

NORCOTT, J. The sole issue in this appeal is whether the workers' compensation benefits payable to a claimant with a 25 percent permanent partial disability in each lung, caused in part by work-related asbestos

exposure, should be apportioned[1] or reduced by the amount of that disability attributable to a concurrently developing nonoccupational disease, specifically cigarette smoking related emphysema. The defendants, Reed and Greenwood Insulation Company (Reed), and AC & S, Inc. (AC & S),[2] appeal[3] from the decision of

[1] Many of the authorities cited herein, and the parties in their briefing of this case, use the term "apportionment" to refer to the reduction of a claimant's benefits based on the degree of disability attributable to an occupational cause. See, e.g., 3 A. Larson, Workers' Compensation Law (2007 Ed.) § 52.06 [4] [d], pp. 52-79 through 52-81. Under our state law pertaining to workers' compensation, the term "apportionment" has, however, historically been used as a term of art to refer to the proportional division of responsibility among various employers or insurers for a claimant's benefits, rather than to any specific reduction of the benefits owed to the claimant in the first instance. See, e.g., *Pizzuto* v. *Commissioner of Mental Retardation*, 283 Conn. 257, 277, 927 A.2d 811 (2007); *Hatt* v. *Burlington Coat Factory*, 263 Conn. 279, 312–13, 819 A.2d 260 (2003). We emphasize that our use of the term "apportionment" in this opinion is intended to remain consistent with the authorities that we cite, and is not to be construed as affecting our state law governing the division of responsibility among multiple employers or insurers.

[2] The named defendant, Transco, Inc. (Transco), and its defendant insurer, Zurich American Insurance Company (Zurich), withdrew their appeal to the compensation review board and also have not appeared in this court. All references to the defendants herein are to Reed and AC & S, and their respective insurers, Hartford Insurance Company and Travelers Property and Casualty. See also footnote 6 of this opinion.

[3] The defendants appealed from the decision of the compensation review board to the Appellate Court pursuant to General Statutes § 31-301b, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

This case was originally decided on November 27, 2007, by a five member panel of this court consisting of Chief Justice Rogers and Justices Norcott, Katz, Palmer and Zarella. See *Deschenes* v. *Transco, Inc.*, 284 Conn. 479, 936 A.2d 625 (2007). Thereafter, the plaintiff moved, pursuant to Practice Book § 71-5, for reconsideration and reargument or, in the alternative, reconsideration en banc. In addition, the Connecticut Coalition of Taft-Hartley Health Funds, Inc., the Hill Health Center, the Connecticut Council on Occupational Safety and Health, the Connecticut Trial Lawyers Association, the New England Health Care Employees Union, District 1199, SEIU, and the Workplace Injury Law and Advocacy Group applied to appear as amici curiae and to file briefs in support of the plaintiff's motion for reconsideration and for reargument. The Connecticut Business and Industry Association and the Insurance Association of Connecticut applied to appear as amici

the compensation review board (board) affirming the decision of the workers' compensation commissioner for the second district, Stephen Delaney, awarding compensation for a 25 percent permanent partial disability in each lung to the plaintiff, George Deschenes. We conclude that further findings of fact are required because apportionment of permanent partial disability benefits is appropriate when a respondent employer is able to prove that: (1) a disability has resulted from the combination of two concurrently developing disease processes, one that is nonoccupational, and the other that is work related; and (2) the conditions of the claimant's occupation have no influence on the development of the nonoccupational disease. Accordingly, we reverse the decision of the board and remand the case for further proceedings.

The record reveals the following facts and procedural history. The plaintiff, who was born in 1945, joined Local 33 of the International Association of Heat and Frost Insulators and Asbestos Workers (union) in 1967. After he joined the union, the plaintiff worked until 1985 as an insulator on numerous commercial construction sites for multiple employers, including Reed and AC & S. During that time, he was exposed to significant amounts of asbestos, with his last exposure occurring in 1985, while he was employed by Transco. The plaintiff has not been able to work full-time since 1994, when

curiae and to file a brief in opposition to the plaintiff's motion for reconsideration and for reargument. We granted the applications of the amici curiae and also those of the parties to file supplemental briefs in this case. We also granted the plaintiff's motion for reconsideration en banc; accordingly, Justice Vertefeuille and Senior Justice Sullivan have been added to the panel. We conclude that this case was correctly decided by the initial five member panel. We have, however, made several substantive changes to the prior decision in this case, and this opinion supersedes our prior decision in all respects.

he was diagnosed with asbestos related pleural lung disease.[4]

Asbestos is, however, not the only toxic substance to which the plaintiff's lungs have been exposed. He started smoking cigarettes at the age of seventeen or eighteen, and he smoked one and one-half to two packs per day from the age of twenty-five until 1991, when he had a heart attack requiring coronary artery bypass surgery. At that point, he reduced his smoking, and currently is down to one cigarette after each meal. The plaintiff has, however, developed emphysema as a result of his cigarette smoking.[5]

The plaintiff filed a claim for compensation with the workers' compensation commission in 1994. After a hearing held in 2003, the commissioner for the eighth district, Amado Vargas, found that the plaintiff had suffered a lung injury as a result of his asbestos exposure at work, and "another lung injury" that resulted from his "long history of cigarette smoking . . . ." Vargas, who desired to appoint an independent physician to assess the plaintiff's condition, left open the apportionment and permanent partial disability claims pending that examination. At a subsequent hearing, Delaney adopted Vargas' findings, and concluded that the plaintiff had sustained a 25 percent permanent partial disability to each lung "as a result of [his] asbestos related injury." Delaney noted that the various physicians who

---

[4] According to expert testimony, which Delaney apparently credited, the plaintiff's asbestos-related impairment is a sign of early asbestosis on the "continuum of asbestos effects," and is characterized by fibrosis, plaques and calcification on the pleura, or surfaces, of both lungs. This condition reduces lung capacity if the plaques thicken sufficiently to entrap the lung " 'like a corset.' "

[5] Emphysema comes under the umbrella term known as chronic obstructive pulmonary disease, and is characterized by scarring and lesions that obstruct the small airways in the lungs, which leads to reduced diffusion and mixing of gases, including oxygen, in the lungs. Diffusion is the movement of gases through lung tissue into the bloodstream, and vice versa.

testified agreed about the extent of the plaintiff's disability, but disagreed about whether that disability was caused by asbestos exposure or smoking. Delaney found, however, that the "work related asbestos exposure was a substantial contributing factor to this injury and resulting permanency," and ordered the defendants to pay permanent partial disability benefits to the plaintiff equating to 25 percent of each of his lungs, apportioned among the defendants, based on his length of prior service with each.[6]

The defendants petitioned the board for review of Delaney's decision. The board agreed with Delaney that the plaintiff's entire disability was compensable. The board concluded that Delaney's conclusions were adequately supported by the testimony of Mark Cullen, a physician who had testified that the plaintiff's lung impairment was the result of both "his asbestos exposure and . . . his 'former smoking,' rather than . . . any smoking that had occurred after the disease symptoms had begun to develop." The board also noted Cullen's testimony that three quarters of the plaintiff's disability was related to his emphysema, with one quarter of that, or 6.25 percent of the total disability, attributable to the asbestos exposure.[7] The board also stated

---

[6] Delaney concluded that Transco was the employer at the time of the plaintiff's last exposure and its insurer, Zurich, was required to administer the plaintiff's claim pursuant to General Statutes § 31-299b. Following a subsequent motion to correct by the defendants D & N Insulation Company, Vedco Insulation, Cummings Insulation Company, and Liberty Mutual Insurance Company, Delaney amended the award to require Reed to pay 63.88 percent and AC & S to pay 1.22 percent of the benefits due to the plaintiff.

[7] The board noted that Delaney was entitled to accept Cullen's testimony over that of Thomas Godar, a physician who had examined the plaintiff at the request of the defendants. Godar agreed that the plaintiff had a 25 percent reduction of capacity in each lung. Although Godar initially had concluded that 5 percent of the total disability was attributable to asbestos exposure, he subsequently changed his opinion after further testing and concluded that none of the plaintiff's disability had been caused by his asbestos exposure.

that Cullen had testified about the "synergistic effects" of the plaintiff's emphysema and asbestos related disease, and specifically "about the interplay between asbestos and smoke exposure that contributes to the [plaintiff's] overall permanency, based on his experience studying 'this population of jointly exposed men.' . . . The ongoing effects of the [plaintiff's] asbestos exposure were not described by [Cullen] as being self-limiting. Thus, it was reasonable to conclude that the effects of the asbestos exposure have continued over time to produce an impairment, whether the progression has happened of its own volition, or in conjunction with the [plaintiff's] smoking-induced emphysema."

Relying on its decision in *Strong* v. *United Technologies Corp.*, No. 4563 CRB-1-02-8 (August 25, 2003), the board further concluded that the plaintiff's "smoking-related emphysema need not be treated separately for the purpose of assigning liability for the lung permanency, even if some doctors calculated the percentage of the impairment that was caused by asbestos exposure. It has long been a fundamental principle of workers' compensation law that an employer takes an employee as it finds him, and that any statutory variation from that principle must be construed to work a minimum encroachment on that rule." The board emphasized that even if the plaintiff's smoking related emphysema is considered a "concurrently developing condition," rather than a preexisting condition, "that argument does not undo the foundational tenet that the employer is responsible for the effects of a compensable injury, even if that injury's toll on a particular claimant is unexpectedly severe because of the way it collaborates with other health problems. Here, the employers and insurers that were on the risk during the [plaintiff's] period of asbestos exposure are responsible for the effects of that occupational exposure on the [plaintiff], with apportionment rights amongst themselves under

[General Statutes] § 31-299b. There is no legal remedy that allows those employers to avoid liability for whatever portion of the [plaintiff's] lung impairment might be traceable to non-work-related emphysema, insofar as it was one of two conditions that combined to cause a single impairment." Accordingly, the board affirmed the decision of Delaney.[8] This appeal followed. See footnote 3 of this opinion.

On appeal, the defendants claim that the board improperly awarded the plaintiff compensation for the entire 25 percent permanent partial disability in each lung. The defendants first argue that they are responsible for only one quarter of the plaintiff's total disability because the plaintiff has two distinct lung injuries, one occupational, and one not. As a corollary to this argument, the defendants also contend that the 25 percent award is improper because there was no finding that the plaintiff's smoking related emphysema, which was a distinct disease process that had developed concurrently with his asbestos related symptoms and was responsible for 75 percent of his disability, was itself occupational in nature in any way and, therefore, compensable. Emphasizing that there is no evidence that the plaintiff's emphysema was a preexisting condition that was aggravated by the asbestos exposure, they contend that the axiom that an employer takes an employee as it finds him is inapplicable and that, as a policy matter, employers should not have to bear the costs of their employees' smoking habits.

In response, the plaintiff, emphasizing the broad construction and application customarily given to the work-

[8] The board further noted that "[w]hether a future worsening of the [plaintiff's] permanency solely attributable to cigarette smoking would be compensable is a separate question that we need not answer here. The [plaintiff's] asbestos exposure and the presence of pleural plaques in his lungs may, of course, continue to play a role in the evolution of further permanency, which would complicate the matter both medically and legally."

ers' compensation statutes, contends that, although it "is undisputed that the [plaintiff] has emphysematous changes in his lungs, and it is undisputed that the [plaintiff] has asbestos-related pleural disease . . . it is far from clear that he has two separate and distinct lung injuries." The plaintiff notes the "synergistic and often difficult to separate" effects of asbestos exposure and cigarette smoking, and also claims that there is no practical way to determine whether he would have a lung impairment in the absence of asbestos exposure, or whether the cigarette related impairment would be the same without the asbestos exposure. The plaintiff emphasizes that the defendants all took him as they found him, specifically, as "a man with a history of smoking and a risk for developing smoking-related disease. Each successive employer took a man with a history of asbestos exposure and a risk for developing asbestos-related disease. And each successive employer took a man with both a history of cigarette smoking and asbestos exposure and a risk for developing synergistic lung disease." In light of the evidence adduced before Delaney, we agree with the defendants.

"As a threshold matter, we set forth the standard of review applicable to workers' compensation appeals. The principles that govern our standard of review in workers' compensation appeals are well established. The conclusions drawn by [the commissioner] from the facts found must stand unless they result from an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them. . . . It is well established that [a]lthough not dispositive, we accord great weight to the construction given to the workers' compensation statutes by the commissioner and [the] board. . . . A state agency is not entitled, however, to special deference when its determination of a question of law has not previously been subject to judicial scrutiny." (Internal quotation marks omitted.) *Coppola* v. *Logistec Connecticut, Inc.*,

283 Conn. 1, 5–6, 925 A.2d 257 (2007); see also *Tracy v. Scherwitzky Gutter Co.*, 279 Conn. 265, 272, 901 A.2d 1176 (2006) ("[n]either the . . . board nor this court has the power to retry facts"); *Gartrell v. Dept. of Correction*, 259 Conn. 29, 36, 787 A.2d 541 (2002) ("[t]he commissioner has the power and duty, as the trier of fact, to determine the facts" [internal quotation marks omitted]).

We note at the outset that the legal difficulty in the present case stems from its factual posture, namely, that Delaney did not find that the plaintiff's emphysema was a preexisting condition that was aggravated by his asbestos-related lung condition, a determination that would have entitled the plaintiff to full compensation under General Statutes § 31-275 (1) (D).[9] See *Gartrell*

[9] General Statutes § 31-275 (1) (D) provides in relevant part: "For aggravation of a preexisting disease, compensation shall be allowed only for that proportion of the disability or death due to the aggravation of the preexisting disease as may be reasonably attributed to the injury upon which the claim is based . . . ."

Moreover, we note that "[§] 31-275 (15) defines occupational disease as any disease peculiar to the occupation in which the employee was engaged and due to causes in excess of the ordinary hazards of employment as such, and includes any disease due to or attributable to exposure to or contact with any radioactive material by an employee in the course of his employment. In interpreting the phrase occupational disease, we have stated that the requirement that the disease be peculiar to the occupation and in excess of the ordinary hazards of employment, refers to those diseases in which there is a causal connection between the duties of the employment and the disease contracted by the employee. In other words, [the disease] need not be unique to the occupation of the employee or to the work place; it need merely be so distinctively associated with the employee's occupation that there is a direct causal connection between the duties of the employment and the disease contracted. . . . Thus, an occupational disease does not include a disease which results from the peculiar conditions surrounding the employment of the claimant in a kind of work which would not from its nature be more likely to cause it than would other kinds of employment carried on under the same conditions." (Citations omitted; internal quotation marks omitted.) *Estate of Doe v. Dept. of Correction*, 268 Conn. 753, 757–58, 848 A.2d 378 (2004); id. (human immunodeficiency virus is occupational disease for correction officers).

v. *Dept. of Correction*, supra, 259 Conn. 43 ("compensating an employee for the exacerbation of a preexisting mental or emotional condition that was caused by a work-related physical injury furthers the beneficent purposes of the Workers' Compensation Act [act]"); see also *Cashman* v. *McTernan School, Inc.*, 130 Conn. 401, 408–409, 34 A.2d 874 (1943) (statutory limitation on compensation for aggravation of preexisting diseases applicable only to preexisting "occupational diseases"). Similarly, Delaney did not find that the plaintiff's emphysema was a "previous disability" and that the asbestos exposure was a "second injury resulting in a permanent disability caused by both the previous disability and the second injury which is materially and substantially greater than the disability that would have resulted from the second injury alone," which would have entitled him to full compensation under General Statutes § 31-349 (a). Instead, the question presented here, namely, whether the act requires the apportionment of benefits when a disability is caused by two separate, but concurrently developing medical conditions, only one of which is occupational in nature, is one of first impression for Connecticut's appellate courts[10] that requires us to fill a gap in our

---

[10] This is not, however, the first time that this issue has arisen in our state. In *Strong* v. *United Technologies Corp.*, supra, No. 4563 CRB-1-02-8, upon which the board relied in the present case, the employers had contended that "the evidence shows that the claimant's smoking-related emphysema did not constitute a pre-existing disability, but rather a separately and concurrently evolving disease process with a distinct etiology and lung damage pattern from that of the asbestosis," and had sought relief from "liability for the portion of the claimant's permanent partial disability that is due to emphysema." The board first concluded that the claimant "did not establish his lung condition as an occupational disease within the definition of § 31-275 (15)" or his emphysema as a preexisting nonoccupational disease, the aggravation of which would require full compensation under § 31-275 (15) and *Cashman* v. *McTernan School, Inc.*, supra, 130 Conn. 401. Despite the fact that the record contained "medical evidence to support the existence of two concomitant disease processes rather than two consecutive disease processes," the board declined to rule "that the portion of the lung damage that is due to the non-work-related disease process is not [the employer's]

statutes.[11] Accordingly, it presents a question of law subject to plenary review. See, e.g., *Tracy* v. *Scherwitzky Gutter Co.*, supra, 279 Conn. 272–73.

In resolving this statutory gap, "we are mindful that the act indisputably is a remedial statute that should be construed generously to accomplish its purpose. . . . The humanitarian and remedial purposes of the act counsel against an overly narrow construction that unduly limits eligibility for workers' compensation. . . . Accordingly, [i]n construing workers' compensation law, we must resolve statutory ambiguities or lacunae in a manner that will further the remedial purpose of the act. . . . [T]he purposes of the act itself are best served by allowing the remedial legislation a reasonable

responsibility under the law." *Strong* v. *United Technologies Corp.*, supra. The board concluded that its precedents did not "allow for such a distinction to be drawn, particularly under the facts of this case" because it previously had "entertained cases in which a 'pre-existing' condition was asymptomatic prior to the occurrence of a compensable injury, yet the portion of disability attributable to the 'pre-existing' condition was nonetheless made the responsibility of the respondent. . . . Even if the claimant's emphysema began manifesting itself concurrently with his asbestosis rather than beforehand, both conditions now contribute to his overall lung impairment. The law does not provide a means of severing the portion of that impairment traceable to his emphysema. The legislature has not drawn such a distinction by statute, and we will not spontaneously begin reading the law to allow such an apportionment of responsibility." (Citation omitted.) Id.

The board noted, however, that the record in *Strong* could be read to support a finding that "the claimant indeed had a pre-existing condition in the form of emphysema" because he had stopped smoking cigarettes prior to his asbestosis manifesting itself, and his asbestos exposures continued after he had stopped smoking. Id. Accordingly, the board determined that "there is sufficient reason to presume that the claimant's emphysema, which was caused by cigarette smoking, was an incipient or latent condition prior to the advent of asbestosis symptoms." Id.

[11] "We have attempted in this case to answer the specific question before us and, in the process, to make sense of a complex statutory scheme that presents gaps and internal inconsistencies . . . . We, therefore, urge the legislature to address these gaps and inconsistencies, because this is an area that, to the extent feasible, should be addressed by specific statutory language rather than by judicial interpretation." *Fredette* v. *Connecticut Air National Guard*, 283 Conn. 813, 839, 930 A.2d 666 (2007).

sphere of operation considering those purposes." (Citations omitted; internal quotation marks omitted.) *Pizzuto* v. *Commissioner of Mental Retardation*, 283 Conn. 257, 265, 927 A.2d 811 (2007).

Our sister states have taken divergent approaches to this issue, and the factual and statutory peculiarities attendant to each state's case law renders it difficult to discern true "majority" or "minority" approaches. The seminal case in this area is *Pullman Kellogg* v. *Workers' Compensation Appeals Board*, 26 Cal. 3d 450, 452–53, 605 P.2d 422, 161 Cal. Rptr. 783 (1980), which involved a pipefitter who had been exposed to numerous toxins, including asbestos, over forty years of work, but who also smoked a pack of cigarettes per day over that period. The pipefitter was diagnosed with chronic obstructive pulmonary disease, specifically chronic bronchitis and emphysema, which a physician's report stated was caused by " 'two factors,' " namely, his occupational exposure and his smoking. Id., 453. He was rated as having a permanent 40 percent disability, and the workers' compensation commissioner reduced the benefits award by 50 percent to reflect the degree to which the disability had an occupational cause. Id., 453–54.

On appeal, the California Supreme Court concluded that the physician's "opinion that 50 percent of [the claimant's] pathology was caused by exposure to harmful substances and the remainder to his smoking habit does *not* provide a basis for apportionment. *It is disability resulting from, rather than a cause of, a disease which is the proper subject of apportionment*; 'pathology' may not be apportioned. . . . The [physician's] report does not attribute any part of the disability to [the claimant's] smoking of cigarettes; rather, it purports to make an apportionment of 'pathology.' Moreover, it does not state whether [the claimant] would have been disabled as the result of the smoking in the absence of

the work-related inhalation of harmful substances. For all that appears in the record, he would not have suffered any disability whatever because of his smoking habit if he had not been exposed to damaging substances in his work. In the absence of such evidence, apportionment was not justified."[12] (Citations omitted; emphasis added.) Id., 454–55.

The California Supreme Court further emphasized that "the fact that [the claimant's] disease resulted from both work-related and nonindustrial causes operating concurrently and that the nonindustrial component did not predate the industrial injury does not militate against application of the principles of apportionment. Any part of [the claimant's] lung disease which was due to his smoking preceded his disability, and *the decisive issue . . . is whether such disease was accelerated or aggravated by his employment and whether its normal progress would have caused any disability absent the exposure to harmful substances in his work.*" (Emphasis added.) Id., 455. Finally, the court emphasized that the burden of proving that "none of the disability is due to a preexisting condition" falls to the employer, who is the party that "benefits from a finding of apportionment . . . ."[13] Id., 455–56.

---

[12] The California statute governing apportionment of benefits for the aggravation of preexisting diseases by a compensable injury is not limited to occupational diseases. See Cal. Lab. Code § 4663 (Deering 2007). In applying the statute, the workers' compensation appeals board must "allow compensation not only for the disability resulting solely from the employment, but also for that which results from the acceleration, aggravation, or 'lighting up' of a prior nondisabling disease. Apportionment is justified only if the board finds that part of the disability would have resulted from the normal progress of the underlying nonindustrial disease." *Pullman Kellogg* v. *Workers' Compensation Appeals Board*, supra, 26 Cal. 3d 454.

[13] The California Supreme Court emphasized that it did not "intend to imply that apportionment is never justified where an employee's disability is due in part to smoking. If there had been medical evidence that some portion of [the claimant's] disability would have resulted from his smoking even without any exposure to harmful substances in his employment, apportionment would have been warranted." *Pullman Kellogg* v. *Workers' Compensation Appeals Board*, supra, 26 Cal. 3d 456 n.5.

We find North Carolina case law even more instructive because that state, like Connecticut, has a statutory gap in this area. In *Morrison* v. *Burlington Industries*, 304 N.C. 1, 4–5, 282 S.E.2d 458 (1981), the claimant, a textile worker, became totally disabled when she contracted byssinosis, a chronic obstructive lung condition caused by exposure to cotton dust. She also suffered from phlebitis, varicose veins and diabetes. Id., 6. The compensation commission concluded that the claimant was entitled to only a 55 percent permanent partial disability award, which reflected the portion attributable to the byssinosis. Id., 7.

On appeal, the North Carolina Supreme Court rejected the claimant's argument that the state workers' compensation act "permits no such apportionment of an award in a case of total incapacity," and that "if an occupational disease acting together with non-job-related infirmities causes total disability the employee *is entitled to compensation for total disability.*" Id., 11. Noting that the workers' compensation act "is not, and was never intended to be, a general accident and health insurance act," the court stated that "the inquiry here is to determine whether, and to what extent, [the claimant] is incapacitated by that part of her chronic obstructive lung disease caused by her occupation to earn . . . . It is overwhelmingly apparent that disability resulting from an accidental injury, or disablement resulting from an occupational disease, as the case may be, must arise out of and in the course of the employment, i.e., there must be some causal relation between the injury and the employment before the resulting disability or disablement can be said to 'arise out of' the employment." Id., 11–12. After considering the state's law defining "occupational diseases,"[14] the court con-

[14] Under North Carolina law, which is much like Connecticut law in all relevant aspects; see footnote 9 of this opinion; a condition is an "occupational disease" if it is "due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment as distinguished from an ordinary disease of life to which the general public is

cluded that the "claimant's disablement resulting from the occupational disease does not exceed 50 to 60 percent and that the remaining 40 to 50 percent of her disability results from bronchitis, phlebitis, varicose veins, diabetes, and that part of her chronic lung disease not caused by her occupation. These ailments were in no way caused, aggravated or accelerated by the occupational disease." Id., 13. The court stated that the industrial commission, therefore, "had no legal authority to award the claimant compensation for total disability when 40 to 50 percent of her disablement was not occupational in origin and was not aggravated or accelerated by any occupational disease."[15] Id.

The North Carolina Supreme Court concluded by summarizing: "(1) an employer takes the employee as he finds her with all her pre-existing infirmities and weaknesses. (2) When a pre-existing, nondisabling, non-job-related condition is aggravated or accelerated by an accidental injury arising out of and in the course of employment or by an occupational disease so that disability results, then the employer must compensate the employee for the entire resulting disability even though it would not have disabled a normal person to that extent. (3) On the other hand, when a pre-existing, nondisabling, non-job-related disease or infirmity eventually causes an incapacity for work without any aggravation or acceleration of it by a compensable accident

---

equally exposed outside of the employment; and . . . the extent of the disablement resulting from said occupational disease, i.e., whether she is totally or partially disabled as a result of the disease." *Morrison* v. *Burlington Industries*, supra, 304 N.C. 12 (discussing N.C. Gen. Stat. § 97-53 [13]).

[15] The court emphasized that the claimant's "chronic obstructive lung disease not due to cotton dust exposure is not 'industry's wreckage.' Neither is her phlebitis, varicose veins nor diabetes." *Morrison* v. *Burlington Industries*, supra, 304 N.C. 14; see also id., 17–18 ("we know that 45 percent of [the claimant's] incapacity for work was not caused, aggravated, or accelerated by an occupational disease or by her exposure to cotton dust during the course of her employment because the [c]ommission so found upon overwhelming evidence to that effect").

or by an occupational disease, the resulting incapacity so caused is not compensable. (4) When a claimant becomes incapacitated for work and part of that incapacity is caused, accelerated or aggravated by an occupational disease and the remainder of that incapacity for work is not caused, accelerated or aggravated by an occupational disease, the Workers' Compensation Act of North Carolina requires compensation only for that portion of the disability caused, accelerated or aggravated by the occupational disease." Id., 18.

We find particularly instructive the application of *Morrison* in *Pitman* v. *Feldspar Corp.*, 87 N.C. App. 208, 360 S.E.2d 696 (1987), review denied, 321 N.C. 474, 364 S.E.2d 924 (1988). In *Pitman*, the claimant was diagnosed with silicosis after twenty-three years of exposure to silica dust, and stopped working at that point because of constant shortness of breath and chest pain. Id., 210. He also was diagnosed with obstructive lung disease resulting from cigarette smoking and asthma, which one physician testified had caused 50 percent of his impairment to be unrelated to silicosis. Id. Following *Morrison*, the court remanded the case to the compensation commission because further findings were needed "regarding whether any portion of the plaintiff's total incapacity to work was caused by conditions unrelated to employment."[16] Id., 214; see also

---

[16] The precedential value of *Morrison* has been limited in the wake of the North Carolina Supreme Court decision in *Rutledge* v. *Tultex Corp.*, 308 N.C. 85, 100, 301 S.E.2d 359 (1983), which distinguished *Morrison* as "rest[ing] on the proposition that when byssinosis is or may be the occupational disease in question and causes a worker to be partially physically disabled, and other infirmities, acting independently of and not aggravated by the byssinosis, also cause the worker to be partially disabled, the worker is entitled to compensation for so much of the incapacity for work as is due to the physical disability caused by the byssinosis." In *Rutledge*, which also involved a textile worker with a history of smoking, the North Carolina Supreme Court considered byssinosis to be a component of the chronic obstructive pulmonary disease that was the sole cause of the claimant's disability. Id.; see also id., 94–95 (The court noted that chronic obstructive pulmonary disease "has several components. Some of these components are seemingly not, in

their incipience at least, work related, for example, bronchitis, emphysema and asthma; while at least one component, i.e., byssinosis, is work related. . . . It is apparently medically impossible even on autopsy objectively to distinguish the effect on the lungs of cigarette smoke inhalation and the inhalation of cotton dust, or between the effects of bronchitis and the inhalation of these substances."). The court then concluded that, as a matter of causation, "chronic obstructive lung disease may be an occupational disease provided the occupation in question exposed the worker to a greater risk of contracting this disease than members of the public generally, and provided the worker's exposure to cotton dust significantly contributed to, or was a significant causal factor in, the disease's development. This is so even if other non-work-related factors also make significant contributions, or were significant causal factors." Id., 101.

The court stated that it adopted the "significant contribution principle" to "strike a fair balance between the worker and the employer in the administration of our Workers' Compensation Act as it is applied to the difficult lung disease cases. To hold that the inhalation of cotton dust must be the *sole* cause of chronic obstructive lung disease before this disease can be considered occupational establishes too harsh a principle from the standpoint of the worker and the purposes and policies of our Workers' Compensation Act. . . . On the other hand, to hold the causation requirement is satisfied if cotton dust exposure contributes to the slightest extent, however miniscule or insignificant, to the etiology of chronic obstructive lung disease, places too heavy a burden on industry. This holding would compromise the valid principle that our Workers' Compensation Act should not be transformed into a general accident and [health] insurance law." (Citation omitted; emphasis added.) Id., 105. Without mentioning apportionment, the court then concluded that the record presented sufficient evidence that a fact finder could conclude either way under its test, and remanded the case for further fact-finding. Id., 106–108.

Commentators have questioned the continuing precedential value of *Morrison* in the wake of *Rutledge*; see 3 A. Larson, Workers' Compensation Law (2007 Ed.) § 52.06 [4] [d], p. 52-80 (Stating that "North Carolina . . . got off on the wrong foot with the case *Morrison* v. *Burlington Industries*" and that "*Morrison* did not survive long. It was in effect overruled by *Rutledge* v. *Tultex Corp.* as to any case in which it is found that the disability was caused by 'chronic obstructive lung disease.' "); G. Smith, Note, "Workers' Compensation—*Rutledge* v. *Tultex Corp./Kings Yarn: Leaving Precedent in the Dust?*" 62 N.C. L. Rev. 573, 579 (1984) ("[i]t may be argued . . . that apportionment still is required if the worker's disability is not caused entirely by chronic obstructive lung disease, or if his occupational disease is identified as byssinosis rather than chronic obstructive lung disease"); see also id., 582 ("*Rutledge*'s rule requiring full compensation whenever a plaintiff's employment has contributed significantly to his occupational disease is a fairer approach to workers' compensation than *Morrison*'s

S.E.2d 234 (1996) (following *Morrison* and *Pitman* and remanding case for factual findings about extent to which claimant's disability resulted from "air flow obstruction caused by prior cigarette smoking as opposed to asbestosis").

Accordingly, on the basis of these well reasoned decisions, we conclude that apportionment or proportional reduction of permanent partial disability benefits[17] is appropriate when a respondent employer is able to prove[18] that: (1) a disability has resulted from the combination of two concurrently developing disease processes, one that is nonoccupational, and the other that is occupational in nature; and (2) the conditions of the claimant's occupation have no influence on the development of the nonoccupational disease.[19] In our view, this

apportionment rule"). Commentary aside, the North Carolina Court of Appeals has concluded that its Supreme Court's decision in *Morrison* remains good law in cases wherein the claimant suffers from two separate medical conditions that have combined to cause a total disability. Put differently, *Morrison,* as distinguished from *Rutledge,* precludes apportionment only in those cases wherein the disability results from a single diagnosed condition. See *Stroud* v. *Caswell Center,* supra, 124 N.C. App. 656–57; *Pitman* v. *Feldspar Corp.,* supra, 87 N.C. App. 215–16.

[17] We acknowledge the concerns of the amici curiae, the Connecticut Council on Occupational Safety and Health, the Connecticut Coalition of Taft-Hartley Health Funds, Inc., the Hill Health Center and the Workplace Injury Law and Advocacy Group, with respect to the potential effect of our conclusion herein on the medical and other benefits awarded to workers' compensation claimants. We emphasize, however, that our conclusion herein is limited solely to the issue raised in this appeal, namely, the apportionment of permanent disability benefits.

[18] The employer bears the burden of proof because it is the party that "benefits from a finding of apportionment . . . ." *Pullman Kellogg* v. *Workers' Compensation Appeals Board,* supra, 26 Cal. 3d 456.

[19] See also *Burton* v. *Rockwell International,* 266 Kan. 1, 7–8, 967 P.2d 290 (1998) (state's apportionment statute did not apply when claimant, who was avid smoker for thirty years and also exposed regularly to dust, dirt and chemical fumes was disabled from adult-onset asthma and bronchitis because it was "single disability" caused by both "occupational and nonoccupational factors"); id., 8 (noting Kan. Stat. Ann. § 44-5a01 [b], which is separate statute requiring employer to prove "by clear and convincing medical evidence to a reasonable probability" that emphysema was caused by employment "solely and independently of all other causes"; aggravation of

conclusion is consistent with the legislature's treatment of the aggravation of preexisting injuries under § 31-275 (1) (D), and second injuries under § 31-349 (a), in that it accommodates two axiomatic principles of workers' compensation law, namely, that to be compensable, the injury must arise out of and occur in the course of the employment, and also "that an employer takes the employee in the state of health in which it finds the employee." (Internal quotation marks omitted.) *Blakeslee* v. *Platt Bros. & Co.*, 279 Conn. 239, 245, 902 A.2d 620 (2006). Accordingly, the board, in relying on its decision in *Strong* v. *United Technologies Corp.*, supra, No. 4563 CRB-1-02-8, applied an incorrect legal standard when it concluded that the plaintiff's "smoking-related emphysema need not be treated separately for the purpose of assigning liability for the lung permanency," and there "is no legal remedy that allows those employers to avoid liability for whatever portion of the claimant's lung impairment might be traceable to non-work related emphysema, insofar as it was one of two conditions that combined to cause a single impairment." Put differently, apportionment or reduction of

existing emphysema is compensable only to extent of aggravation); *Kingery* v. *Ford Motor Co.*, 116 Mich. App. 606, 619, 323 N.W.2d 318 (1982) (plaintiff's disability is " 'fully compensable' " with no apportionment when "employment conditions and cigarette smoking jointly contributed to plaintiff's pulmonary pathology and . . . there was no showing that either emphysema or bronchitis was contracted solely by work or non-work causes"); *Field* v. *Johns-Manville Sales Corp.*, 209 N.J. Super. 528, 530, 507 A.2d 1209 (App. Div.) (under state's apportionment statute, "the judge was required to give the employer credit for the functional loss attributable to cigarette smoking when that loss can be quantified" with respect to claimant with 25 percent partial disability resulting from asbestosis and bronchitis), cert. denied, 105 N.J. 531, 523 A.2d 172 (1986); cf. *Fry's Food Stores of Arizona* v. *Industrial Commission*, 177 Ariz. 264, 266–68, 866 P.2d 1350 (1994) (disability for worker with both smoking-related chronic obstructive pulmonary disease and "baker's lung" was fully compensable and not subject to apportionment because although nonoccupational illness caused lung "impairment," "baker's lung" was " 'proverbial last straw' " that resulted in claimant's total *disability*, or inability to work).

permanent partial disability benefits is appropriate only in those cases wherein different diseases, one of which is occupational in nature, have combined to cause, in effect, two different disabilities, even if they ultimately affect the same bodily part or function.[20]

We further conclude that additional fact-finding proceedings are required because the record in the present

[20] By way of illustration, we disagree with the analyses in *Jenkins* v. *Halstead Industries*, 17 Ark. App. 197, 706 S.W.2d 191 (1986), *Anderson* v. *Brinkhoff*, 859 P.2d 819 (Colo. 1993), and *Forte* v. *Fernando Originals, Ltd.*, 667 A.2d 780 (R.I. 1995), wherein the courts apportioned awards in cases involving a disability that resulted from a single disease that was caused by multiple factors, some of which were not occupational. In *Jenkins*, the court upheld an apportionment of the claimant's disability payments, which was attributable only to a single diagnosis of chronic obstructive pulmonary disease, based on 92 percent to his smoking and 8 percent to his occupational exposure to chemical fumes and talc dust. *Jenkins* v. *Halstead Industries*, supra, 201.

In *Anderson*, the claimant, a carpenter, had a genetic disorder that caused progressive emphysema and cardiac problems, which was aggravated coequally by his cigarette smoking and occupational exposure to sawdust and construction site dust. *Anderson* v. *Brinkhoff*, supra, 859 P.2d 820. The administrative law judge had concluded that his smoking and occupational dust exposures were "co-equal aggravating factors" in the acceleration of his emphysema, and ruled that he should receive 50 percent of the benefits to which he otherwise would have been entitled. Id., 821. On subsequent appeal, the Colorado Supreme Court upheld this order after concluding that "where there is no evidence that occupational exposure [to a hazard] is a necessary precondition to development of the disease," "the claimant [suffers from] an occupational disease only to the extent that the occupational conditions have contributed to the claimant's overall disability." (Internal quotation marks omitted.) Id., 824–25. Although the court concluded that aggravation of the emphysema was compensable because the "risk associated with the exposure to sawdust and other airborne particulate matter is greater for a carpenter than the risk of exposure outside the workplace," it nevertheless also upheld the 50 percent apportionment because the "occupational dust exposure was a co-equal aggravating factor in the acceleration of [the claimant's] emphysema . . . ." Id., 825.

Similarly, in *Forte*, without a statute providing to the contrary, the court upheld an order that reduced the employer's medical payments obligation by one half based on testimony that the claimant's "respiratory injury" was caused 50 percent by smoking and 50 percent by his exposure to airborne compounds in the workplace, even though the claimant's "medical treatment was for a single ailment caused by several contributing factors, one of

case does not permit us to uphold the decision of the board under the correct legal standard, and also does not permit us to direct judgment in favor of the defendants because the commissioners have not made any findings with respect to the apportionment or proportional reduction; see footnote 1 of this opinion; of the plaintiff's benefits. Specifically, it has not been claimed that the plaintiff's emphysema is an occupational disease. Similarly, Delaney did not find that the conditions of the plaintiff's occupation influenced the development of his emphysema, or that it was impossible to make that determination.[21] Moreover, although there is evidence in the record, including Cullen's testimony and

which was the workplace." *Forte* v. *Fernando Originals, Ltd.*, supra, 667 A.2d 783–84.

[21] The plaintiff, relying on a commissioner ordered physician report authored by Michael Conway, which the board declined to consider because it was not formally admitted as an exhibit, contends that *"we simply do not know and cannot tell when one disease process began, which disease process was first, or which disease process is causing which impairment.* This is not a case where there are 'two independent processes [that] developed over time,' as the [defendants] argue. This is a case of an individual who had exposures to two disease-causing substances that react synergistically and complexly over long periods of time to cause one significant impairment." (Emphasis added.) The portion of Conway's report cited by the plaintiff states that he agreed that the asbestos-related disease caused 5 to 6.25 percent of the plaintiff's disability, and disagreed with Godar's conclusion that the asbestos exposure played no role in the plaintiff's disability. See footnote 7 of this opinion. In explaining his disagreement with Godar's conclusion, Conway then stated that he disagreed with Godar's assessment because "individuals with concurrent, obstructive and restrictive processes are difficult to evaluate because, in fact, air flow obstruction secondary to [chronic obstructive pulmonary disease] can be less obvious in a patient with underlying fibrotic disease because of [the] tendency for a stiff lung to improve flow rates. I therefore feel that the simple spirometry remaining stable and the plain chest x-ray which is a very poor measure of parenchymal fibrosis remaining unchanged are not adequate to state that there has been or has not been progression." We do not view Conway's report as supporting the proposition that it is impossible to determine whether the plaintiff's asbestos exposure influenced the development of his emphysema. Rather, viewed in context, this portion of the report refutes Godar's conclusion that the asbestos exposure did not have any effect on the plaintiff's total disability.

report, as well as the report of Michael Conway, the physician appointed by a commissioner, to support apportionment of the 25 percent permanent partial disability among the two diseases, Delaney did not make a specific finding of fact corresponding to that evidence.

Furthermore, the board's reliance on Cullen's testimony with respect to the "interplay between asbestos and smoke exposure that contributes to the [plaintiff's] overall permanency" in support of its conclusion that "the effects of the asbestos exposure have continued over time to produce an impairment, whether the progression has happened of its own volition, or in conjunction with the [plaintiff's] smoking-induced emphysema," was improper. Viewed in context, that portion of Cullen's testimony had nothing to do with the effect of asbestos exposure on the development of emphysema. Rather, that testimony pertained only to the "synergistic" effect of asbestos exposure and cigarette related emphysema on the potential development of *lung cancer*, a medical condition *not* at issue in this case.[22] Accordingly, we conclude that the conclusion of

[22] The plaintiff's attorney questioned Cullen about the plaintiff's risk for the development of lung cancer, and Cullen testified as follows on the basis of epidemiologic data about insulators who have worked with asbestos:

"A. Like most, [the plaintiff has] heavily smoked. Like all, he's been heavily exposed to asbestos. And he, therefore . . . harbors approximately average risk for his peer group . . . somewhere between 50 and 60 percent of insulators who started in the trade prior to the [1970s] die of malignancy. That's begun to tail off now, but that was experienced for decades. Of those, about half are lung cancer. Another 10 percent are mesotheliomas, and the rest have a smattering of respiratory and [gastrointestinal] cancers, obviously, they're not immune from getting cancers that other people get as well, but those are the ones they get to a greater degree.

"Q. And correct me if I'm wrong, those numbers seem that [the plaintiff] is at a greatly elevated risk of developing those cancers relative to the general population?

"A. Well, I just described his risk. And the general population, you know, is 21 or 22 percent of all of us will die of cancers, so his risk overall is about probably double, from double, two and a half times that. Virtually none of us will die of mesothelioma, so his risk in regard to mesothelioma is unique to his trade.

the board does not withstand review under the standard that we have articulated in this opinion, and we remand the case for further fact-finding proceedings with respect to the apportionment or proportional reduction of the plaintiff's permanent partial disability benefits.

The decision of the compensation review board is reversed and the case is remanded to the board with direction to reverse the commissioner's decision, and to remand the case to a new commissioner for further proceedings according to law.

In this opinion the other justices concurred.

"Lung cancer risk . . . for the general population is almost entirely a function of smoking background and work history. He would be in about the highest risk category . . . one could find.

"Q. And smoking, why is that, [be]cause smoking and asbestos exposure interact *synergistically*?

"A. Particularly deleterious combination, yes.

"Q. And approximately how many times more likely is an individual who is exposed to asbestos and was a smoker, approximately how many times more likely is that individual to contract lung cancer than someone who had neither one or the other?

"A. Again, everything has to do with dose, but if you take someone like this who has been basically a pretty heavy smoker and was in the most high risk trade, his overall risk is somewhere [twenty] to [fifty] times elevated over most of us in the room." (Emphasis added.)