******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

WILLIAM D. HART *v.* FEDERAL EXPRESS
CORPORATION ET AL.
(SC 19523)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and
Robinson, Js.

*Argued December 14, 2015—officially released April 19, 2016*

*David A. Kelly*, with whom was *Ryan D. Ellard*, for
the appellants (defendants).

*Robert B. Keville*, with whom was *Roger T. Scully*,
for the appellee (plaintiff).

*Opinion*

ESPINOSA, J. This case arises from an incident in which the plaintiff, William D. Hart (claimant), allegedly suffered heart problems and associated psychological injuries during the course of his employment as a courier for the named defendant, Federal Express Corporation (FedEx). The Workers' Compensation Commissioner for the Second District (commissioner) found that both the claimant's physical and psychological injuries were compensable under the Workers' Compensation Act (act), General Statutes § 31-275 et seq., and awarded him total incapacity benefits covering a period of approximately forty-seven weeks. FedEx and its claims administrator, the defendant Sedgwick CMS, Inc., appeal from the decision of the Workers' Compensation Review Board (board) upholding the commissioner's findings and award. On appeal, the defendants contend that neither the claimant's physical nor his psychological injuries are compensable under the act and, in the alternative, that the commissioner's award was excessive. We disagree and, accordingly, affirm the decision of the board.

The following facts, as found by the commissioner, and procedural history are relevant to the disposition of this appeal. The claimant was employed by FedEx from 1987 through September 15, 2009, the claimed date of injury at issue in this case. The claimant worked as a courier, delivering packages to customers along a specified route. His daily job duties involved inspecting his vehicle and inventorying and loading parcels onto the vehicle. After doing so, he would confer with his manager about the number of stops to be made, and then drive from the FedEx terminal in the town of Norwich to his assigned delivery territory in the town of Stonington, including the Mystic and Pawcatuck areas.

Once in his delivery area, the claimant would spend the first part of the morning, until 10:30 a.m., making priority overnight deliveries in Mystic. He would then begin making the next round of morning deliveries in and around the borough of Stonington (borough), to be completed by noon. He would then proceed into Pawcatuck and on into North Stonington. After completing all of his deliveries and pickups for the day, the claimant would return to Norwich, stopping at a gas station to top off his truck.

The claimant, who was forty-seven years old on the claimed date of injury, was avid about physical fitness. He would rise each day at 4 a.m. and work out at the gym for as long as two hours before going to work. He engaged in intense gym workouts, including weightlifting and " 'cardio' " components, as many as six times per week, and he also went running approximately three times each week.

The claimant's job requirements were demanding as

well. His delivery area encompassed the tourist attractions of Mystic; Pawcatuck, which is the gateway to the beaches in Westerly, Rhode Island; and the heavily traveled Route 1 corridor between those towns. Daytime driving in this area, particularly during the summer tourist season, is challenging, and is complicated by having to cross the Route 1 drawbridge over the Mystic River. The claimant's workday averaged ten to twelve hours. Nevertheless, he was, by all accounts, a dedicated and hardworking employee who took great satisfaction in his job. He received a notable award for his service in 2004, and had an unblemished employment record prior to 2009.

In early 2009, however, the claimant came under the direction of a new manager and the demands of his job began to escalate. His delivery area was enlarged, increasing the number of stops and the associated driving time. The claimant's typical " 'stop count' " climbed to 12.5 per hour, leaving less than five minutes on average for him to drive to and complete each delivery. The claimant asked his managers for help, but was told that nothing could be done.

FedEx policy provides that each driver receive a one-half hour daily lunch break. FedEx also has strict standards for the timeliness of deliveries, however, and drivers are judged and graded on their ability to satisfy FedEx customers and complete assigned stops by the appointed deadlines. Owing to the increasing size of his delivery area and the traffic demands of the tourist season, during the summer of 2009, the claimant often was unable to find time even for bathroom breaks or his lunch break before 4:30 p.m. The claimant's managers were made aware that his route had become unworkable, but they took no steps to mitigate the situation and, according to the claimant, continued to increase the demands of his route.

At the end of one shift in June, 2009, the claimant made his usual refueling stop in Norwichtown before returning to the nearby FedEx terminal. After refueling, however, he failed to secure the cap properly on the truck's fill pipe. When he arrived at the terminal yard, he smelled diesel fuel and realized that a small amount of fuel had spilled out of the fill pipe. The claimant reported the spillage to the office manager, who promptly called the fire department and the police. The incident ultimately involved the intervention of a hazardous materials team and federal occupational health officials. The claimant, who believed that FedEx had overreacted, was sent home. Upon returning to work for his next shift, the claimant was reprimanded for the fuel spill incident. On June 24, 2009, he received a written warning regarding that incident. At the same time, FedEx gave the claimant another written warning, stating that, when he took time off in May, 2009, he had exceeded his allotment of scheduled time off. The

claimant testified that this overage was the result of how FedEx chose to account for five days he had been out of work when his mother died, classifying only three of the five days as bereavement leave.

Having always worked hard to be a model employee, the claimant was greatly distressed by this turn of events. Between the written warnings and the steady increases in his workload—allegedly disproportionate to those of other drivers—the claimant began to think he was being set up by FedEx and, for the first time, worried about losing his job.

On September 15, 2009, the claimant began his work day as usual. After taking inventory of the parcels, however, he concluded that his schedule would require fifteen delivery stops per hour, or one stop every four minutes on average. After loading his vehicle, he became convinced that this was too many stops and that it would be impossible for him to complete all the deliveries in the allotted time. When he reported his stop count to the manager on duty, the claimant asked if some of the stops could be assigned to another driver. This request was refused.

The day was "hot" and the claimant's assigned truck had a transparent roof to help illuminate the shelves of parcels in the back. This type of roof tended to create a greenhouse effect, increasing the temperature inside the truck when the weather was warm. The vehicle was not air-conditioned.

The claimant proceeded that morning to his assigned delivery area and began making his priority overnight deliveries. He was rushing, but did manage to make all of his deliveries in Mystic by the 10:30 a.m. deadline, with the exception of one stop where the customer was not present to sign for a package that required a signature. The claimant then drove to the borough, where he needed to complete his deliveries by noon. At approximately 11:40 a.m., the claimant arrived at a stop on Tipping Rock Road and concluded that the long driveway to the house was too narrow and overgrown to drive his truck down. With only twenty minutes left to complete his morning deliveries, he opted not to walk the parcel to the house. Instead, he attached the parcel in the mailbox post and then left a voice message on the customer's phone. He just managed to finish his remaining borough stops by noon. The claimant then proceeded in the direction of Pawcatuck, making his " 'SOS deliveries,' " all of which needed to be completed by 3 p.m. After that, he was scheduled to make his " 'E2' " deliveries, which needed to be completed by 4:30 p.m., at which time he was scheduled to make some pickups before returning to Norwich.

As the claimant was rushing to complete his " 'SOS deliveries,' " he received a complaint from the Tipping Rock Road customer. Given the written warnings he

had received in June, this complaint caused him significant concern as he continued his route. Then, as the claimant approached Pawcatuck, he received instruction to return to Mystic, on the opposite side of Stonington, to reattempt delivery of the parcel that was not signed for that morning. The claimant requested that the customer be asked to meet him at a midway point, but his manager rejected this request, so the claimant had to drive back to Mystic. When he returned to the location, the customer again was not present to sign for the package, and the claimant had to spend additional time filling out a detailed report before departing again for Pawcatuck to resume his route.

By this time, the claimant was significantly behind schedule and under great stress. He had not had time to stop for food or drink or to use the restroom, and he was hot and sweating. To further complicate matters, on his way back to Pawcatuck, he encountered traffic delays, as the local high school was dismissing its students. By then, he was one full hour behind schedule in his deliveries and would need to complete an impossible thirty stops per hour.

As he rushed through his stops, running between his truck and the customers' houses carrying heavy packages, the claimant began to feel ill and light-headed. He noticed a fluttering sensation in his chest and a shortness of breath, along with a growing sense of panic. His pace started to slow as he felt increasingly winded and more panicky. Fearing that he would be written up again, the claimant pressed on for approximately one hour before concluding that he could not finish his route. He stopped at the fire station on Liberty Street in Pawcatuck, where he was scheduled to make a delivery, and called FedEx for a substitute driver. He took time to organize his remaining parcels for the next driver, then went into the fire station, made his scheduled delivery, and only then asked to be checked out by fire personnel. His heart rate was found to be more than 200 beats per minute, and an ambulance was called. The claimant was rushed to Backus Hospital in Norwich, where he came under the care of Amr Atef, a cardiologist. An electrocardiogram showed that, at one point, his heartbeat was 300 beats per minute.

Emergency room testing showed that the claimant presented with arrhythmia, an abnormal heart rhythm, known as " 'atrial flutter.' " Atrial flutter is caused by an electrical " 'short-circuit' " in the right atrium of the heart, which serves as the heart's natural pacemaker. At some point while the claimant was in the emergency room, his heart rhythm devolved into atrial fibrillation, a form of irregular tachycardia, or irregular accelerated heartbeat. Blood work taken at the hospital showed that the claimant had low potassium levels, known as hypokalemia, a potential result of dehydration.

The claimant remained in the hospital overnight and,

with medication, his heartbeat eventually returned to normal. The diagnosis on discharge the next afternoon was " 'paroxysmal atrial flutter and fibrillation.' " The claimant also was diagnosed with hypertension. Although the arrhythmic episode had resolved, the claimant was kept on beta-blocker medication, and was advised to take aspirin and to monitor his potassium intake. He was placed on medical leave until September 26, 2009, and instructed to follow up with a cardiologist, who would have him wear a heart monitor to check for repeats of the arrhythmia. When the claimant saw Atef for a follow-up appointment on September 30, 2009, the palpitations had stopped, his heart rhythms were normal, and the claimant was feeling well. Although Atef suspected that the September 15, 2009 incident had been an isolated one, he instructed the claimant to remain out of work until they received the heart monitor results.

On October 1, 2009, the claimant resumed his workouts at the gym, but he initially kept his workouts less stressful than they had been before the incident. At an appointment with Atef on November 6, 2009, the claimant reported that he had returned to the gym " 'without any significant difficulty, but . . . continue[d] to have anxiety and stress.' " The claimant reported having intermittent palpitations, particularly around the time of the first informal hearing on his workers' compensation claim on October 30, 2009. Atef opined that the claimant was doing well from a cardiac standpoint but continued to be " 'very stressed out about work.' " Because the cardiac event monitor the claimant had been wearing showed that he was still having episodes of paroxysmal atrial arrhythmia, Atef increased the claimant's dosage of beta-blocker medication and referred him to a cardiac electrophysiologist. Atef advised the claimant to avoid dehydration, but offered no specific instructions regarding his level of activity. He did agree that the claimant should not return to work until after his cardiac consultation and he also recommended that the claimant see his primary care physician to discuss medication for anxiety.

Between late 2009 and early 2012, the claimant was seen at varying times by seven health-care professionals for symptoms or conditions related to the September 15, 2009 incident: Atef; Roger El-Hachem, the claimant's primary care physician; Steven L. Zweibel, the Director of Cardiac Electrophysiology at Hartford Hospital; Kevin J. Tally, a cardiologist who examined the claimant for FedEx; Michele Chenevert, a licensed family therapist and clinical social worker; Mahmoud Okasha, the psychiatrist who supervised Chenevert; and Donald R. Grayson, a psychiatrist who examined the claimant for FedEx. These professionals each offered: (1) diagnoses of the claimant's physical and mental health conditions; (2) accounts of the etiology of these conditions; (3) medication and treatment recommendations; and (4)

opinions as to the claimant's level of disability and ability to resume work. This lengthy evaluation and treatment history, which is detailed in the decision of the commissioner, may be summarized as follows.

With respect to the claimant's physical condition, the treating and evaluating physicians generally agreed that the claimant suffered from atrial flutter, atrial fibrillation, and hypertension. In July, 2010, the results of a second thirty day heart monitor test showed that he continued to experience intermittent recurrence of atrial flutter with rapid ventricular response. Although El-Hachem initially opined that the claimant also had hypertensive cardiomyopathy, defined by the commissioner as damage to the heart muscle, he later concluded—and Tally concurred—that the claimant did not actually have cardiomyopathy.

With respect to the claimant's mental health condition, El-Hachem referred the claimant for a psychiatric evaluation in May, 2010, after the claimant reported that he had been experiencing anxiety and depression. During his evaluation and subsequent therapy sessions, the claimant reported feeling depressed, overwhelmed, stressed, anxious, humiliated, embarrassed, and resentful. He also reported difficulties with sleep and concentration, and a tendency to avoid any objects or places that he identified with FedEx. These symptoms were magnified at times when the claimant had communications or interactions with FedEx, or around the anniversary of the September 15, 2009 incident. At times, the claimant associated his mental health symptoms with the heart problems he experienced on that date. For example, he reported that he was angry that had been pressured to the extent that he was transported and admitted to the hospital with atrial fibrillation and could have died; that his mind raced with fears that his arrhythmia would recur or that he would die; and that he experienced flashbacks and " 'vivid dreams' " of the 2009 ambulance ride. At other times, he appeared to associate his symptoms with resentment over how FedEx had treated him as an employee, the perceived unfairness of his situation, the stresses associated with his ongoing legal battle with FedEx, and his reactions to being out of work and to the associated financial stresses.

Chenevert diagnosed the claimant with adjustment disorder with anxiety and depression, and rated his level of functioning at 65 out of 100. Okasha diagnosed him with post-traumatic stress disorder (PTSD) and generalized anxiety disorder, which, the psychiatrist opined, resulted in the claimant " 'being almost homebound' " and suffering from dysphoria, anxiety, weight loss, insomnia, and an inability to relax or concentrate. Grayson agreed that the claimant was not consciously or unconsciously fabricating or amplifying his symptoms, and diagnosed him with PTSD, major depressive

disorder, panic disorder with agoraphobia, and hypochondriasis.

There was general agreement, then, as to the nature of the claimant's physical and psychological health problems. With respect to the cause or etiology of these conditions, there also was general agreement among the medical experts that, although the claimant's atrial fibrillation and arrhythmia likely preexisted the events of September 15, 2009, the physical stress, dehydration, and psychological anxiety that he experienced on that day could have aggravated the condition and caused it to manifest. El-Hachem opined that " 'if a person has an underlying atrial fibrillation, stress could increase the heart rate enough to make the condition symptomatic.' " Zweibel likewise opined that " 'stress and anxiety could be a contributing factor to these arrhythmias [but] may not be the sole etiology.' " At one point, Zweibel went so far as to state that " 'the physical stress of [the claimant's] job at FedEx was a significant contributing factor in the development of his cardiac arrhythmias.' " He later backed off this statement, however, and took the position that stress and anxiety can bring on an arrhythmia. Even Tally, who examined the claimant on behalf of FedEx, while opining that the development of an atrial arrhythmia could be attributed to his hypertension, also acknowledged that once the claimant was in arrhythmia, the physical conditions and stress under which he worked that day could have sped up his heart rate and thereby " 'aggravated his uncontrolled atrial arrhythmias.' " Tally later more definitively opined that one could presume, given the claimant's symptoms and history, that physical activity on September 15, 2009, aggravated the claimant's underlying arrhythmia, although he questioned whether the events of that date changed the course of the illness in any substantial way. The psychiatrists, Okasha and Grayson, both agreed with Tally that the claimant's work at FedEx aggravated his cardiac problems, and they further opined that his work was the cause of or a significant factor in the development of his PTSD. Okasha explained that " '[t]he consequences of being disabled from his employment and the fear of future cardiac episodes have resulted in symptoms that fulfill the criteria for [PTSD. The claimant] experienced an event that involved serious injury and a threat to his physical integrity. His response involved intense fear, helplessness, and horror. He suffers from recurrent and intrusive distressing recollections and dreams of the event.' "

To treat his heart conditions, the claimant was, at various times, prescribed metoprolol, lisinopril, Diovan, and aspirin. His physicians also recommended that the claimant undergo an ablation procedure, during which surgeons would scar his heart to disrupt the atrial fibrillation, but the claimant declined to do so, and his metoprolol dose was increased instead. For his mental health issues, the claimant was prescribed Lexapro and Klo-

nopin. He underwent weekly therapy sessions, as well as monthly appointments for psychiatric medication management. By the summer of 2012, however, Grayson did not believe that these treatments had resulted in maximum medical improvement and he recommended that the claimant be treated by a PTSD specialist and that alternative medications be considered.

The only question on which there was a significant divergence of opinions among the medical experts was with respect to the claimant's level of disability and his ongoing inability to work. Following the events of September 15, 2009, the claimant repeatedly sought and obtained from his various treating physicians notes indicating that he was not medically cleared to return to work. There is some indication, however, that his physicians at times were reluctant to continue issuing these notes, or had doubts as to whether the claimant was totally incapacitated.

As previously noted, in September, 2009, Atef advised the claimant to remain out of work until he received the results of a heart monitor test. In early November, Atef, after having reviewed the test results, agreed that the claimant should not return to work until after he had a cardiac consultation.

On January 7, 2010, El-Hachem excused the claimant from work for an additional month. On January 25, 2010, after having received a letter from the claimant stating that his employer did not care about his well-being and that he was not " 'emotionally, physically or mentally ready' " to return to the work environment, El-Hachem opined that the claimant was temporarily totally disabled " 'due to atrial fibrillation and hypertensive cardiomyopathy.' "[1] Because " 'aggravating factors' " such as anxiety and stress can worsen symptoms of heart palpitations, El-Hachem indicated that " 'the best thing to do is to have him rest or give him some time to recover until we figure out what's going on.' "

On April 15, 2010, during an examination by Tally, the claimant reported working out on a treadmill at a 15.2 percent grade and a pace of 4.2 miles per hour for thirty minutes, something Tally stated that most people could not do for even three minutes. Tally opined the claimant was only 10 percent to 11 percent disabled and that he could return to work. " 'As a cardiologist,' " he wrote, " 'I would not disable him from work at this time as it appears his [heart] rhythm is under adequate control with current metoprolol; nor has he suffered malignant hemodynamic effect such as syncope from his arrhythmia.' "

On April 23, 2010, during a deposition, El-Hachem was confronted with the claimant's testimony about these recent intense workouts. El-Hachem described these sessions as a type of stress test that the claimant obviously was passing. So long as the claimant did not

have fibrillation during these workouts, El-Hachem stated, he would not consider him to be totally incapacitated. Ultimately, El-Hachem conceded that he might need to reconsider his earlier opinion to that effect. Nevertheless, on May 26, 2010, El-Hachem gave the claimant a note to permit additional medical leave from work until June 26, 2010, in order to give him time to use the cardiac event monitor.

When the claimant returned to El-Hachem on June 26, 2010, El-Hachem did not issue a new disability note. On July 8, 2010, however, Atef agreed to extend the medical leave for another thirty days, because the claimant was due to have a psychiatric evaluation. Atef issued a note keeping the claimant out of work due to "recurrent cardiac arrhythmia, hypertension and persistent anxiety." Atef informed the claimant, however, that he would not be able to give him any further extensions. The claimant's medically excused absence from work thus expired on August 7, 2010.

Lastly, the record reveals that the claimant has not sought alternative employment since September 15, 2009. Approximately six months after the September 15, 2009 incident, the claimant approached FedEx seeking to return to work on a part-time basis. FedEx declined his request, taking the position that giving the claimant part-time work would amount to a transfer, and that company policy precluded employees from requesting transfers within one year of having received a written warning. Later in 2010, FedEx informed the claimant that he would not have a job to return to when he was able to work. In therapy, the claimant expressed that he was hesitant to seek other employment, lest he jeopardize his long-term disability and his case against FedEx. To bolster his spirits, however, in the period following his injury he did resume working out at the gym, helped to paint his father's house and to clear snow from the roof, and kept busy helping neighbors. He was granted Social Security disability benefits in May, 2012.

Following a formal hearing, the commissioner concluded that the claimant had sustained physical and psychological injuries arising out of and in the course of his employment. Specifically, the commissioner found that, prior to the date of injury, the claimant had a subclinical heart condition of which he was unaware and that did not require treatment or interfere with his ability to engage in heavy physical labor. On September 15, 2009, FedEx subjected the claimant to unmanageable workload demands and forced him to work at an unreasonably rapid pace, without allowing time to take breaks for food, hydration, or even personal comfort. As a result, the claimant became dehydrated, which resulted in depressed potassium levels and left him more susceptible to cardiac arrhythmia. In addition, the commissioner found that these unreasonable demands

resulted in psychological stress, which, in tandem with the physical exertion of rushing to keep up with his schedule, elevated the claimant's heart rate in excess of 200 beats per minute and caused a supraventricular tachycardiac event that required emergency transport and hospitalization. As a result of the day's events, the claimant's heart condition was aggravated significantly and worsened to the point of requiring long-term, post-hospital treatment, medication, and monitoring. The commissioner also concluded that the physical trauma that the claimant experienced on September 15, 2009, and the ensuing emergency treatment were substantial factors causing him to develop PTSD and related psychological symptoms.

With respect to the claimant's ability to work, the commissioner found that it was reasonable for the claimant's cardiologist and primary care physician to exercise caution in monitoring his condition and response to treatment before clearing him for work, and, therefore, that he was temporarily totally incapacitated for purposes of General Statutes § 31-307 (a)[2] from September 15, 2009 through August 7, 2010, the final date to which Atef found the claimant to be disabled. The commissioner found no credible evidence, however, that the claimant remained disabled after that time, or that he was ready and willing to seek and accept alternative employment. Consistent with these findings, the commissioner determined that the claimant was entitled to total incapacity benefits, pursuant to § 31-307 (a), from September 15, 2009 until August 7, 2010, and he awarded benefits accordingly. The commissioner denied the claimant's requests for partial or total incapacity benefits for the period after August 7, 2010.

The defendants filed a motion to correct several of the commissioner's findings. The commissioner denied all of the requested corrections, other than to clarify that the period of temporary total disability awarded to the claimant amounted to forty-six weeks and four days, rather than forty-six weeks and seven days as originally stated. The defendants appealed from the commissioner's decision to the board, which affirmed the findings and award. The defendants appealed from the decision of the board to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. We now affirm.

I

The defendants first argue that the board improperly upheld the commissioner's findings that the claimant suffered compensable physical and psychological injuries arising out of his employment. The resolution of these claims depends in no small part on the standard by which we must review the commissioner's findings. We therefore begin by setting forth the well established

standard of review applicable to workers' compensation appeals.

"The commissioner has the power and duty, as the trier of fact, to determine the facts"; (internal quotation marks omitted) *Gartrell* v. *Dept. of Correction*, 259 Conn. 29, 36, 787 A.2d 541 (2002); and "[n]either the . . . board nor this court has the power to retry facts." (Internal quotation marks omitted.) *Tracy* v. *Scherwitzky Gutter Co.*, 279 Conn. 265, 272, 901 A.2d 1176 (2006); see also Regs., Conn. State Agencies § 31-301-8. "The conclusions drawn by [the commissioner] from the facts found [also] must stand unless they result from an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them. . . . [Moreover, it] is well established that [a]lthough not dispositive, we accord great weight to the construction given to the workers' compensation statutes by the commissioner and review board. . . . Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . We have determined, therefore, that the traditional deference accorded to an agency's interpretation of a statutory term is unwarranted when the construction of a statute . . . has not previously been subjected to judicial scrutiny [or to] . . . a governmental agency's time-tested interpretation . . . .

"Furthermore, [i]t is well established that, in resolving issues of statutory construction under the act, we are mindful that the act indisputably is a remedial statute that should be construed generously to accomplish its purpose. . . . The humanitarian and remedial purposes of the act counsel against an overly narrow construction that unduly limits eligibility for workers' compensation. . . . Accordingly, [i]n construing workers' compensation law, we must resolve statutory ambiguities or lacunae in a manner that will further the remedial purpose of the act. . . . [T]he purposes of the act itself are best served by allowing the remedial legislation a reasonable sphere of operation considering those purposes." (Citations omitted; internal quotation marks omitted.) *Sullins* v. *United Parcel Service, Inc.*, 315 Conn. 543, 550–51, 108 A.3d 1110 (2015). With these principles in mind, we turn to the defendant's claims on appeal.

A

The defendants first argue that the commissioner's finding that the claimant's heart condition arose out of his employment on September 15, 2009, is unsupported by the record. Specifically, the defendants contend that (1) it is "counterintuitive" to think that a "physical specimen" such as the claimant could have been "even phased" by having to run back and forth from his truck

in the heat carrying heavy packages, and (2) "the sheer reality is that most employers ask a great deal of their workers," and the stresses associated with the claimant's work at FedEx were nothing out of the ordinary. On the basis of these assumptions, the defendants posit that the physical and psychological stresses associated with the claimant's employment on the date in question could not have triggered his episodes of cardiac arrhythmia and tachycardia and the onset of hypertension. We are not persuaded.

We begin by noting that, to be compensable under the act, a personal injury sustained by an employee must arise both (1) out of and (2) in the course of his employment. General Statutes § 31-284 (a). "Speaking generally, an injury arises out of an employment when it occurs in the course of the employment and as a proximate cause of it." (Internal quotation marks omitted.) *Blakeslee* v. *Platt Bros. & Co.*, 279 Conn. 239, 244–45, 902 A.2d 620 (2006). It is well established that, when an employee has a preexisting, asymptomatic medical condition, and that condition is aggravated by injuries sustained during the course of his employment and thereafter becomes symptomatic and necessitates treatment, the injury is deemed to have arisen out of the employment and is compensable. As we have explained: "[There is] no difference between a fresh infection and the awakening of an old one. The [workers' compensation] statute is not concerned with pathology, but with industry disability; and a disease is no disease until it manifests itself. Few adults are not diseased, if by that one means only that the seeds of future troubles are not already planted; and it is a [commonplace] that health is a constant warfare between the body and its enemies; and infection mastered, though latent, is no longer a disease, industrially speaking, until the individual's resistance is again so far lowered that he succumbs." (Internal quotation marks omitted.) *Smith* v. *State*, 138 Conn. 620, 624–25, 88 A.2d 117 (1952), quoting Judge Learned Hand in *Grain Handling Co.* v. *Sweeney*, 102 F.2d 464, 466 (2d Cir.), cert. denied, 308 U.S. 570, 60 S. Ct. 83, 84 L. Ed. 478 (1939); see also *Deschenes* v. *Transco, Inc.*, 288 Conn. 303, 322, 953 A.2d 13 (2008) (noting that employer must take employee in state of health in which it finds him). Our sister courts routinely have applied this rule in the context of work-related episodes of cardiac arrhythmia or tachycardia.[3]

In the present case, the defendants argue that the commissioner was required to reject the opinions of five medical experts, all of whom, with knowledge of the claimant's exemplary physical condition and impressive exercise regimen, opined that his conditions of employment did aggravate or could have aggravated his heart problems. Most notably, the defendants' own cardiology expert testified that "one could presume, given the claimant's symptoms and history, that physical activity on September 15, 2009, aggravated [his] underlying

rhythm." "[T]he trier of fact—the commissioner—was free to determine the weight to be afforded to that evidence." *Marandino* v. *Prometheus Pharmacy*, 294 Conn. 564, 594, 986 A.2d 1023 (2010). After reviewing all of the relevant evidence of record, the commissioner rejected the defendants' theory, and we will not disturb that finding on appeal.

In this regard, we cannot help but observe that, in their briefs to this court, the defendants studiously have avoided any mention of certain noteworthy facts, facts that were found by the commissioner and that are supported by adequate evidence in the record. In arguing that the claimant's employment could not have been a proximate cause of his physical injuries, for example, the defendants neglect to discuss the following facts: that the claimant was required to spend a ten to twelve hour day working in an unair-conditioned truck that magnified the ambient heat; that although this "dedicated, hardworking" employee had repeatedly informed his managers at FedEx that his delivery schedule had become unworkable, they continued to increase his stop count; that this delivery schedule not only left no time for the claimant to take his allotted lunch break from the time he began work at 7 a.m. or 8:30 a.m. until after 4:30 p.m., but that there was not even time for him to stop for hydration or to use the restroom during that period; and that, as a result of these factors, he became dehydrated and potassium depleted on the date in question, leaving him especially vulnerable to certain forms of cardiac arrhythmia. We are skeptical of the defendants' suggestion that most Connecticut employers require similarly situated employees to labor under such conditions.

Nor have the defendants offered any authority for their "intuitive" belief that an individual who is capable of exercising intensely necessarily is immune from the types of work-related physical and psychological stresses that might aggravate a latent heart condition. Rather, the defendants' intuitions were contradicted by the preponderance of expert medical evidence in the record, which the commissioner credited. We are compelled to defer to those findings. See *Fair* v. *People's Savings Bank*, 207 Conn. 535, 539–40, 542 A.2d 1118 (1988).

B

We next consider the defendants' argument that the claimant's PTSD and other psychological injuries are not compensable under the act. The defendants contend that, as a matter of law, compensation for those injuries was barred by General Statutes § 31-275 (16) (B) (iii). That statute provides that, for purposes of the act, a compensable personal injury "shall not be construed to include . . . [a] mental or emotional impairment that results from a personnel action, including, but not limited to, a transfer, promotion, demotion or termina-

tion . . . ." General Statutes § 31-275 (16) (B) (iii). The defendants argue that the events that the commissioner identified as causes of the claimant's PTSD and other psychological injuries—the arrhythmia and tachycardia he experienced on September 15, 2009, and the ensuing ambulance ride and hospitalization—actually arose from and were merely components of (1) the claimant's preexisting anxieties over having received two reprimands in June, 2009, which gave rise to a fear that he would lose his job if he were to receive another reprimand, and (2) the stresses he suffered after the events of September 15, 2009, as a result of being out of work and prosecuting a contested compensation claim. Accordingly, the defendants contend, the claimant's psychological injuries resulted from a personnel action and are not compensable. We are not persuaded.

We recognize that there is evidence in the record to support the defendants' theory that, both prior to and on the claimed date of injury, the claimant experienced worry and anxiety with respect to his employment situation with FedEx. There also is evidence that such feelings persisted in the months following the injury, during which time the claimant was unable to resume his employment with FedEx and the parties engaged in a contentious legal dispute. The commissioner found, however, that other factors arising from the claimant's employment, factors that were unrelated to any actual or potential[4] personnel actions, also were substantial factors in causing his PTSD and associated anxiety, panic, and depression. See *Marandino* v. *Prometheus Pharmacy*, supra, 294 Conn. 591 (for purposes of workers' compensation, claimant need only establish that employment was substantial factor causing claimed injury). Specifically, the commissioner found that the claimant's PTSD resulted from the September 15, 2009 attack of atrial fibrillation and resulting need for emergency medical treatment, which led the claimant to fear that he would die of a heart attack and to feel unsafe when traveling far from his treating physicians. Although the commissioner agreed that the loss of the claimant's job likely aggravated his psychological condition, the commissioner expressly rejected the defendants' theory that personnel considerations were the primary cause of his anxiety and effectively eclipsed all other contributing factors. Rather, the commissioner credited the opinions of the psychiatric experts that "the emotional trauma of having a cardiac malfunction, requiring emergency transport with advanced life support to a hospital—where he then required prolonged emergency measures to restore his heart to a sustainable heartbeat—represents a life-threatening event that was sufficient to cause PTSD."

The commissioner further found that the September 15, 2009 attacks of arrhythmia and tachycardia that precipitated the claimant's PTSD arose not only from employment-related anxieties but also, to a substantial

extent, from (1) physical and mental exhaustion resulting from having to race to meet an unreasonable and unmanageable delivery schedule on a hot day in heavy traffic, and (2) dehydration and mineral depletion resulting from having to work long hours in a hot truck without adequate opportunity to eat, drink, or use a restroom. There is sufficient evidence in the record to support the commissioner's findings in this regard; see part I A of this opinion; and the defendants have failed to provide any plausible explanation as to how the dehydration and resultant mineral deficiencies that precipitated the claimant's heart problems and associated PTSD could have been the result of personnel decisions, real or imagined. We are compelled again to defer to the commissioner's factual findings. Accordingly, we conclude that the board properly upheld the commissioner's determination that the claimant's psychological as well as physical injuries were compensable under the act.

## II

The defendants next argue that, even if the claimant's injuries arose out of his employment and were compensable, the commissioner went astray in concluding that those injuries entitled him to total incapacity benefits for the entire period from September 15, 2009 through August 7, 2010. We have defined total incapacity as "the inability of the employee, because of his injuries, to work at his customary calling or at any other occupation which he might reasonably follow." (Internal quotation marks omitted.) *Rayhall* v. *Akim Co.*, 263 Conn. 328, 350, 819 A.2d 803 (2003). The defendants offer two arguments as to why the claimant was capable of resuming work of some sort prior to August 7, 2010.[5] First, they contend that the claimant could not have been totally disabled for that entire period if he was able to return to the gym a mere two weeks after the incident and to resume his normal vigorous workouts by the spring of 2010. Second, the defendants argue that the opinions of the treating physicians who excused the claimant from work during the nearly forty-seven weeks in question are, for a variety of reasons, not credible, and that the commissioner instead should have credited the opinion of the defendants' expert, who only would have excused the claimant from work for less than that time period. We disagree.

Once again, the defendants' arguments challenge the commissioner's factual findings and credibility determinations and, therefore, must overcome a heavy burden. See R. Carter et al., 19 Connecticut Practice Series: Workers' Compensation Law (Supp. 2015–2016) § 8:37, p. 163 ("the determination of whether a claimant is totally incapacitated is a factual one, and particularly impervious to appellate review" [internal quotation marks omitted]). With respect to the defendants' first argument, the commissioner found that the claimant

was able to resume his gym workouts over time without difficulty but also found that the claimant remained "very stressed out about work" and continued to suffer related bouts of paroxysmal atrial arrhythmia. The commissioner concluded that, even if the claimant had no physical restrictions on account of his heart condition, it was reasonable for his treating physicians to hold him out of work during the period in question to observe and monitor his condition and his response to treatment. During that time period, the claimant saw various physical and mental health professionals for diagnostic and treatment purposes, underwent several periods of prolonged heart monitoring, weighed whether to undergo surgical treatment, and experimented with various medications to treat his heart conditions and anxiety. Indeed, at the time the claimant met with the defendants' psychiatric expert, Grayson, in August, 2010, Grayson recommended that the claimant continue to experiment with alternative medications and treatment modalities so as to better control his mental health conditions. In light of the commissioner's well substantiated finding that the claimant, despite his impressive physical condition and fitness regimen, nevertheless had suffered work-related heart injuries and associated PTSD on September 15, 2009; see part I A of this opinion; we cannot gainsay the commissioner's ultimate conclusion that it was a reasonable precaution for the claimant's treating physicians to keep him fully out of work until they were able to complete their diagnoses and settle on a treatment regimen that would protect him from both the physical and psychological stresses of work.

The defendants' second argument—that the various physicians who recommended that the claimant remain completely out of work after November 18, 2009, were not credible, and that the commissioner instead should have credited the opinions of the defendants' expert, who concluded that he was only partially incapacitated—likewise founders against our standard of review. See *Marandino* v. *Prometheus Pharmacy*, supra, 294 Conn. 594 ("[t]he credibility of the witnesses and the weight to be accorded to their testimony is for the trier of fact" [internal quotation marks omitted]); *Nicotra* v. *Bigelow, Sanford Carpet Co.*, 122 Conn. 353, 359, 189 A. 603 (1937) ("[a] conclusion reached by a commissioner by comparison and examination of conflicting professional opinion . . . can rarely be found erroneous"). In the present case, the commissioner found the opinion of the defendants' expert, Tally, to be less persuasive than that of the claimant's treating physicians, and nothing in our review of the record compels us to disturb that finding. Accordingly, we reject the defendants' argument that the board improperly upheld the commissioner's finding that the claimant was temporarily totally incapacitated until August 7, 2010.[6]

The decision of the Workers' Compensation Review Board is affirmed.

In this opinion the other justices concurred.

[1] As we previously have noted, El-Hachem later concluded that there was insufficient evidence to support a diagnosis of cardiomyopathy.

[2] General Statutes § 31-307 (a) provides in relevant part: "If any injury for which compensation is provided under the provisions of this chapter results in total incapacity to work, the injured employee shall be paid a weekly compensation equal to seventy-five per cent of the injured employee's average weekly earnings as of the date of the injury . . . ."

[3] See, e.g., *Crescent Towing & Salvage Co.* v. *Collins*, 228 Fed. Appx. 447, 448–49 (5th Cir. 2007); *Dept. of Correction* v. *Industrial Commission*, 182 Ariz. 183, 187, 894 P.2d 726 (App. 1995); *Oxley* v. *Sattler*, 710 So. 2d 261, 265 (La. App. 1998), writ denied as improvidently granted, 739 So. 2d 183 (La. 1999); *Carson Tahoe Regional Healthcare* v. *Jain*, Docket No. 54725, 2010 WL 5135239 (Nev. December 9, 2010); *Sullivan* v. *Sysco Corp.*, 199 App. Div. 2d 849, 849–50, 606 N.Y.S.2d 77 (1993); *Morley* v. *State Accident Ins. Fund*, 23 Or. App. 82, 84–86, 541 P.2d 160 (1975); see also *Sullins* v. *United Parcel Service, Inc.*, supra, 315 Conn. 551–52 (stating principle with respect to heart disease generally); J. Asselin, Connecticut Workers' Compensation Practice Manual (1985) p. 54 (advising that, in determining whether heart disease arises out of employment, commissioner should consider whether, in period leading up to attack, claimant worked under extreme temperatures or performed activities requiring unusual exertion or emotional stress).

[4] Even if we were to accept the defendants' theory of the etiology of the claimant's psychological injuries, the defendants conceded at oral argument before this court that their theory depends on the assumption that the claimant suffered significant stress and anxiety on September 15, 2009, out of a fear that he would be reprimanded or fired if he were unable to satisfy FedEx's performance expectations. The defendants, however, were unable to identify anything in the text or history of § 31-275 (16) (B) (iii) suggesting that that provision applies to mental or emotional impairments arising from a *potential or hypothetical* employment action, or one that an employee fears might occur. Because we must defer to the commissioner's finding that the claimant's PTSD did not arise primarily from such fears, however, we need not determine whether such fears, taken alone, could implicate the statutory exception in the absence of any actual adverse personnel action.

[5] See footnote 6 of this opinion.

[6] To the extent that the defendants also argue that, as a matter of law, a physician's note that keeps a patient out of work for precautionary reasons cannot constitute evidence that the patient is totally incapacitated unless the note expressly opines that the patient is incapable of working in any capacity, we decline to review this claim because it is inadequately briefed. See *Stafford* v. *Roadway*, 312 Conn. 184, 188 n.4, 93 A.3d 1058 (2014). We do note, however, that the board, when construing § 31-307 (a), has afforded wide latitude to commissioners with respect to the types of evidence they may consider in evaluating whether a claimant is totally disabled. See *O'Connor* v. *Med-Center Home Health Care, Inc.*, 140 Conn. App. 542, 554, 59 A.3d 385, cert. denied, 308 Conn. 942, 66 A.3d 884 (2013). The board has refrained from requiring any specific type of evidence, and has permitted the fact finder to extrapolate unemployability from various sources. Id., 554–55. In particular, the board has affirmed an award of total incapacity benefits even in the absence of medical evidence categorically stating that a claimant was totally unable to work. Id., 555. The board's interpretation of the statute is consistent with the remedial purposes of the act, and also with the approach followed by other jurisdictions, which have concluded that a workers' compensation commissioner may find an employee totally disabled on the basis of a note from a physician that recommends that the employee remain out of work for a specified period of time but does not expressly opine that the employee is totally disabled or unable to work in any capacity. See, e.g., *Marriott at Wardman Park* v. *Dept. of Employment Services*, 85 A.3d 1272, 1277 (D.C. 2014); *Blair* v. *Wal-Mart Stores, Inc.*, 818 So. 2d 1042, 1051 (La. App. 2002); *Corbin* v. *Moody's Restaurant*, Me. Workers' Compensation Board No. 05-019096 (May 15, 2006).